691 N.E.2d 35 (1998)
294 Ill. App.3d 581
229 Ill.Dec. 99
In the Interest of M.Z., a minor (The People of the State of Illinois, Petitioner-Appellee,
v.
Esther Hernandez, Respondent-Appellant).
No. 1-96-2040.
Appellate Court of Illinois, First District, Third Division.
January 21, 1998.
*36 Northwestern University Legal Clinic, (Bruce A. Boyer and Jordon L. Kruse, Senior Law Students, of counsel), Chicago, for Respondent-Appellant.
Jack O'Malley, State's Attorney of Cook County (Renee Goldfarb, Celeste Stewart Stack, Scott L. Clark, Assistant State's Attorneys, of counsel), Chicago, for Petitioner-Appellee.
Justice BURKE delivered the opinion of the court:
Respondent Esther Hernandez appeals from two orders of the circuit court finding that respondent's son, M.Z., was "abused or neglected," as defined in section 2-3 of the Juvenile Court Act (705 ILCS 405/2-3 (West 1996)), based on lack of care and injurious environment (705 ILCS 405/2-3(1)(a), (b)), and adjudging M.Z. a ward of the court and *37 awarding custody of M.Z. to the Department of Children and Family Services (DCFS) based on the court's determination that respondent was unable to care for M.Z. On appeal, respondent argues that: (1) the trial court's finding that M.Z. was abused or neglected was against the manifest weight of the evidence because respondent did not know and could not have reasonably known that her sister, M.Z.'s babysitter, would leave the child unattended; and (2) the court's finding that respondent was unable to care for her son based on her inability to make informed decisions about what was in the best interests of her son was against the manifest weight of the evidence because the trial court improperly relied on her "borderline" I.Q. score; the trial court improperly connected her association with M.Z.'s father, Marcos Sr., and his previous drug dealing with her abilities as a parent; the fact that her sister left M.Z. unattended was not a sufficient basis for a finding that she was unable to care for M.Z.; and the requirements of additional drug testing and parenting classes were not relevant to her ability to currently make informed decisions about M.Z. For the reasons set forth below, we remand the cause, with directions.
On October 5, 1995, Bonnie Miller (a/k/a Bonnie Herron), a DCFS employee who had been assigned to monitor M.Z. and respondent, discovered five-year-old M.Z. at his home alone and unattended. Miller called the police, who later arrived at the home and removed the child. The State subsequently filed a petition for adjudication of wardship of M.Z. which alleged that respondent neglected M.Z. by leaving him alone in a "situation that required judgment or actions that were beyond the child's level of maturity, physical condition and/or mental abilities," and that respondent left M.Z. "home alone without a proper care plan."
On October 10, 1995, a temporary custody hearing was held. At the hearing, the trial court questioned respondent regarding her employment. She stated that she worked for a company that made uniforms, and earned $220 per week. The trial court then appointed the public defender to represent her. Thereafter, the State informed the court that it had filed a motion to amend its petition to include three counts of abuse: (1) physical abuse; (2) substantial risk of physical injury; and (3) excessive corporal punishment. The State further stated that it had learned that respondent threw a knife at M.Z., and a probation officer found cigarette burns on his arm, as well as indications of a beating with a belt. The trial court allowed the State to amend its petition to include the charges of abuse.
The State then called its first witness, Bonnie Miller. She testified that she was a follow-up worker for DCFS; she was assigned to respondent's case on August 7, 1995, and at that time, M.Z. was living with his paternal grandmother, Frances Martinez; she went to Martinez' home to look for M.Z., but discovered that he was not there; Martinez told Miller that M.Z. was with his mother; and Miller then "called [respondent's] house" and "a female" answered the phone. Thereafter, Miller went to respondent's house and, when she arrived 10 minutes later, no one was at home. Miller then went back to Martinez' home, where Martinez told her that M.Z. once told her that respondent threw a knife at him.
The following day, Miller, accompanied by the police, went to respondent's home to speak with her and M.Z. When she arrived, Miller spoke with respondent's sister, who was outside with her children and M.Z. M.Z., who appeared very shy, would not give her any direct answers. Miller noticed "little marks" on M.Z's cheek and asked him what had happened. M.Z. responded that he had been bitten by a mosquito. Respondent then arrived home, and she and Miller talked. Respondent agreed to participate in any services that DCFS would recommend.
Miller further testified that on October 5, she arrived at respondent's home at approximately 8:35 a.m. and found no one at home. Miller went back to her office and called respondent's home. M.Z. answered the phone, and was crying. Miller asked M.Z. to look around for an adult in the home, and when M.Z. returned to the phone, he said that no one was there. Miller stated that she then went to respondent's house and called the police. When the police arrived, *38 Miller made a report, took protective custody of M.Z. and escorted M.Z. to the police station.
Miller also testified that Jinny Caufield, a probation officer assigned to Frances Martinez' nephew's case, had seen M.Z. on various occasions. According to Miller, Caufield told her that she noticed "little whips on [M.Z.'s] feet from a belt buckle," she had seen respondent "force [M.Z.] into the car" and she had seen cigarette burn marks on M.Z. Miller further stated that Martinez thought that respondent had been abusing drugs. Martinez told Miller on one occasion that respondent had "come after" M.Z., Martinez thought respondent was "on something" and asked respondent to leave M.Z. with her, and respondent "refused and took the baby, ran in the alley with the baby and left * * *[her] car in the middle of the street." On cross-examination, Miller stated that when she questioned M.Z. about whether respondent had thrown a knife at him, he did not respond.
On redirect examination, Miller recommended that M.Z. be placed with his paternal grandmother, Martinez. On recross-examination, Miller stated that when she began her testimony that day, she was going to recommend that M.Z. return home under an order of protection. In response to a question by the trial court, Miller stated that the date was October 5, 1995, when she found M.Z. home alone at approximately 9:44 a.m., and the police arrived at approximately 10:20 a.m.
Florina Guerrero, respondent's sister, testified that she lived in the basement of the same building where respondent and M.Z. lived. On the morning of October 5, respondent came downstairs and asked her to take care of M.Z. Guerrero went back to her apartment, got her children and returned upstairs to be with M.Z. She later left M.Z. alone at approximately 9:30 a.m., returned at approximately 10:05 a.m., found M.Z. gone and the two doors to the apartment open. After she noticed M.Z. was missing, she looked around for him, and the woman who lived on the first floor told her that "they took [M.Z.]." Guerrero stated that she did not see the police come to the house. Guerrero also stated that she usually baby sat for her sister, and that M.Z. was not going to school that day because he had a stomach ache and had diarrhea the day before. On cross-examination, Guerrero stated that respondent would go to work at approximately 6 a.m. and return home at 3 p.m., and would always leave M.Z. in her care. Guerrero further stated that she never left M.Z. alone, and this incident was the first time she had done so.
In response to questions by the public guardian, Guerrero testified that she received a phone call from respondent the morning of October 5, at approximately 6 to 7:30 a.m., asking her to care for M.Z. that day. She did not know where respondent was calling from, but respondent stated she was in a car when she was calling. The guardian then asked Guerrero if M.Z. was alone at that time, and Guerrero responded that he was not alone because he was sleeping and her nine-year-old daughter was with him.
The trial court found that probable cause existed that M.Z. was "abused or neglected" based upon the fact that respondent left M.Z. alone "without an appropriate care plan." The trial court ordered that M.Z. be removed from the home and placed in the temporary custody of the DCFS guardianship administrator. The trial court also directed DCFS to prepare and file a case plan within 45 days, and set the matter for an adjudicatory hearing.
At the adjudicatory hearing on April 16, 1996, Frances Martinez, M.Z.'s paternal grandmother, testified that M.Z. was born on June 15 or 16, 1990, and at the time of his birth, M.Z., respondent, and M.Z.'s father, Marcos Sr., were all living with Martinez in her home. Martinez recalled that in July 1994, she saw respondent strike M.Z. with a belt. Martinez also testified about an event in April 1994, on respondent's birthday, when she walked into respondent's bedroom and she saw respondent getting high while M.Z. was in the room; respondent was smoking a cigarette which smelled like "PCP." When asked how she knew what PCP smelled like, Martinez stated that it smelled like "wart medicine."
*39 Martinez further testified that in November 1994, her son, Marcos, Sr., respondent, and M.Z. were living with her at the time, the police arrived at her home and told her respondent and Marcos Sr. had been arrested for possession of PCP, Marcos Sr. was outside in a police squad car, the police showed Martinez a bottle of liquid which she smelled, and she said that the liquid smelled like blister medicine. Martinez further testified that she had seen a bottle similar to the one the police showed her in respondent and Marcos Sr.'s bedroom. Martinez also stated that she questioned respondent about the substance that same day, and respondent responded that she had some "rollings and foil paper [which respondent said] were dip squares." Martinez described the items as "[w]et cigarettes wrapped up in foil," and stated that the wrapped cigarettes smelled like PCP.
Martinez further stated that her son had been in a gang called the Insane Disciples, and that he had been shot and killed due to his gang involvement. Martinez also stated that respondent had been in a gang called Ambrose, and that in February 1995 respondent told her that she was in a gang called the Queen Disciples. Martinez further stated that M.Z. was currently living with her and that respondent never gave her any money to care for M.Z. while he was living with her.
In response to questions by the public guardian, Martinez stated that she had seen respondent hit M.Z. "a couple of times"; in 1993, around respondent's birthday, she saw respondent slap M.Z.; and after respondent would discipline M.Z., she would see marks left on M.Z.'s body. On cross-examination, Martinez stated that from December 1994 until approximately June 1995, M.Z. lived with her, and respondent was not at her house very often. After June 1995, respondent moved out of Martinez' home and removed M.Z. with the assistance of police officers. Since M.Z.'s removal from her home in June 1995, Martinez had no contact with M.Z. Martinez also stated that Marcos Sr. had used PCP and had been arrested for PCP possession; after August 1995, M.Z. would sometimes stay with her in her home; and sometime in September 1995, she received a call from the Social Security Administration (SSA), and the SSA asked her if M.Z. was living with her and she said he was.
The State then called Bonnie Herron (a/k/a Bonnie Miller) as a witness. She testified that she was employed as a DCFS worker assigned to M.Z.'s case in July 1995. When she was first assigned to his case, respondent had been brought in under charges of risk of harm and inadequate supervision of M.Z. Herron stated that she met with respondent in August 1995, and told her that she would be visiting every month; she next visited respondent in September 1995, but no one was home at that time; and on October 3, 1995, respondent called Herron at her office to say that she and M.Z. had moved in with her mother on the second floor of a three-flat building.
Herron's testimony regarding the events on October 5 was similar to her testimony given at the prior temporary custody hearing: she went to visit respondent on October 5; when she arrived at respondent's home at 8:35 a.m., no one answered the door; she rang the bell at the first floor apartment but again no one answered; she returned to her office and called respondent at her home at approximately 9 a.m., M.Z. answered the telephone, and he was crying hysterically; M.Z. said that his mother was at work and he was alone in the house; she asked him to make sure no one was there and, after M.Z. looked through the house, he stated that he was alone; she then left her office to return to respondent's house; she arrived at approximately 9:44 a.m. and she saw M.Z. in the window crying; she asked M.Z. to open the door for her, and she went into the home with M.Z.; and she checked the apartment and discovered that no one was in the house with M.Z. Herron further stated that she then called the police and the "hot line"; at approximately 10:25 a.m., the police arrived; she and a police officer stayed in the home approximately 20 minutes, after which time they took M.Z. to the police station and took him into protective custody; and at the station, M.Z. said that Florina Guerrero was taking care of him but had left to take the other children to school.
*40 On cross-examination, Herron stated that as a result of previous allegations against respondent of risk of harm and inadequate supervision of M.Z., she requested that respondent participate in parenting classes. Herron stated that respondent was complying with the parenting classes, but had not "complied" prior to October 5,1995. Herron also stated that respondent's building had a first floor apartment and a basement apartment; on October 5, she did not knock on the door of the basement apartment; and there was no downstairs buzzer to the second floor apartment, so she had to knock on the door on the first floor apartment and hope that someone on the second floor would hear. Herron further stated that there were no other signs of neglect or abuse in the home or on M.Z. when she found him alone on October 5; Martinez had been the source for the previous report of neglect and abuse in July 1995, but the allegations of physical abuse were unfounded; another report against respondent between July and October 1995 was also unfounded; no one other than Martinez had ever made accusations against respondent for physical abuse of M.Z.; Martinez was the sole source of other allegations about respondent unlawfully using M.Z.'s social security distributions; Herron had written a letter to the SSA confirming that M.Z. lived with respondent in order to provide her with a record necessary to show that respondent was in fact caring for M.Z.; and Martinez had made allegations that respondent was abusing drugs, but that there was no current indication that respondent was abusing drugs.
Chicago police officer James Veraveic testified that on October 5, 1995, he received a call to assist a DCFS worker at 2243 South Homan, respondent's home. When he arrived at approximately 10:25 a.m., he searched the apartment and, aside from M.Z., found no one home. He remained in the apartment with Herron until approximately 11:10 a.m. He did not attempt to contact anyone else in the building, but on his way out, encountered a "female Latino woman, probably 40-42 years old" who asked him where he was taking M.Z. Veraveic stated that the woman he spoke to was not respondent's sister.
Carmen Mogica, a DCFS employee, testified that she was employed by DCFS as an investigator, and was assigned to M.Z.'s case on October 6, 1995. Mogica spoke with respondent to schedule a home visit on the same day. She went to respondent's home that day, but found that respondent was not at home. On cross-examination, Mogica stated that she spoke with respondent on October 11 about the incident on October 5. Respondent told Mogica that on the morning of October 5, she left M.Z. with her sister Florina Guerrero. Mogica further stated that after her investigation, she did not learn of any evidence which would indicate that respondent was lying about the circumstances surrounding the morning of October 5.
The State rested, and respondent testified in her own behalf. She stated that from 1990, when M.Z. was born, until 1994, during which time she was living with Martinez, Martinez did not have any caretaking responsibilities for M.Z. When Marcos Sr. died in 1994, respondent and M.Z. continued to live with Martinez. After Marcos Sr.'s death, respondent and Martinez began to experience problems in their relationship because Martinez began making "a lot of false reports" against respondent. In June 1995, respondent and M.Z. moved out of Martinez' home and, in August 1995 shortly after they moved, respondent would not allow M.Z. to visit Martinez.
Respondent further testified that she normally left for work at approximately 6 a.m., her mother left at approximately 6:20 a.m., she had made an arrangement with her sister to take care of M.Z. when she and her mother were at work, and she never knew of any time when Guerrero would leave M.Z. alone while Guerrero was caring for him. Respondent also stated that on October 5, 1995, she phoned her sister to come upstairs to her apartment because she was leaving the apartment, and she needed her sister to take care of M.Z. After Guerrero arrived, respondent left at approximately 7:15 a.m. Respondent stated that she expected Guerrero to stay with M.Z. until she arrived home later that day. At approximately 10:45 a.m., respondent received a page from her sister, *41 and she called her sister at approximately 10:50 a.m. and her sister told her that DCFS had taken M.Z. away. When respondent arrived home at approximately 12:30 p.m., she phoned Miller, who told respondent she would contact her within five days. Respondent stated that she never hit M.Z. with a belt, she never smoked drugs in front of M.Z. and she had never been arrested. Respondent also stated that in April 1995, M.Z. burned his hand on a toaster at Martinez' home. Respondent further stated that she never abused M.Z., and that when she wanted to discipline him, she would tell him that he could not go shopping with her.
On cross-examination, respondent testified that prior to M.Z.'s birth, she used marijuana, but after his birth, she never used drugs. Respondent also stated that she was not with Marcos Sr. when he was arrested for drug possession. She further stated that her sister normally took care of M.Z. while she was at work; on October 5, 1995, she was on vacation from work and she left her home that morning to go to Joliet regarding some parking tickets; and her sister took her own two children to school, and when she did, she brought all the children.
Florina Guerrero, assisted by an interpreter, testified that she took care of M.Z. on a regular basis. On the evening of October 4, 1995, respondent called her and asked her if she would take care of M.Z. the following day. The next day, Guerrero spoke with respondent on the phone, and respondent asked her to come upstairs because respondent had to go to Joliet. When Guerrero arrived, M.Z. was sleeping, and respondent left the apartment at approximately 7:10 a.m. Guerrero stated that she did not drive her children to school that day; "[o]ne [child] walks and the other the bus passes by and [picks up the child]." Guerrero further stated that she went downstairs to her apartment to change her child's diaper at 9:45 a.m. and, after she finished, she returned to respondent's apartment at approximately 10:05 a.m. and discovered that M.Z. was not in the apartment. She then called respondent on respondent's pager, and called the police at approximately 10:30 or 11 a.m. Guerrero further stated that she did not speak with respondent until respondent returned home at approximately 12 or 12:20 p.m. Guerrero also stated that she never saw respondent hit or harm M.Z. in any way.
After closing arguments, the trial court stated that it had considered the weight and sufficiency of the testimony, and determined that respondent violated section 2-3(1)(a) of the Act by her acts of "neglect, [and] lack * * * of care," and section 2-3(1)(b) of the Act, "that being neglect, injurious environment." The court did not state what facts it relied on in making its rulings. The court declined to make findings regarding physical abuse, substantial risk of physical injury and excessive corporal punishment, but stated "that any neglect or abuse of * * * [M.Z.] * * * [was] not the result of physical abuse." The trial court then set a dispositional hearing date pursuant to section 2-27 of the Act (705 ILCS 405/2-27 (West 1996)).
At the dispositional hearing on May 3, 1996, the State called Luzviminda Cabrera, an employee of the Child Welfare Agency of the YMCA of Metropolitan Chicago, as a witness. Cabrera testified that she was a caseworker assigned to M.Z.'s case and that M.Z. was currently placed with his paternal grandmother, Frances Martinez. Cabrera also stated that she had contact with respondent, and that respondent was participating in parenting classes, had taken drug tests, and had had a "psychological test." A drug test had recently been performed and the results had not been issued. Cabrera further stated that "there was a drug assessment made previously" and "[t]he recommendation said that based on the assessment that * * * [respondent] should do random urine drops." Cabrera also testified that respondent had participated in two supervised visits with M.Z. since the date of her last hearing on April 16, and Cabrera recommended that M.Z. be placed with the guardianship administrator in the best interest of M.Z.
On cross-examination, Cabrera testified that she had been assigned to M.Z.'s case for less than 30 days; the psychological evaluation recommended parenting classes for respondent; Cabrera did not plan on changing M.Z.'s placement in the next six months; respondent had performed a drug test in *42 December 1995 which did not indicate any drug use; respondent had been notified of a drug test on March 25, 1996, to be administered on March 27, but she did not take the drug test until April 3; the ultimate goal was to return M.Z. to the custody of respondent; and Cabrera did not believe that respondent had any psychological problems based upon respondent's psychological evaluation.
The State then read into the record the following information from respondent's psychological evaluation:
"Information attained during the assessment suggests that Esther does not consistently make decisions that insure the safety of her son [M.Z.]. She allows her child to live in and be exposed to an environment where the deceased boyfriend regularly produced and packaged for resale the illicit drug PCP. And the son burned his hand on a toaster while in the care of the maternal [sic] grandmother. Esther allowed him to return.[F]ound alone, responsible for appropriate supervision."
Respondent then testified that she was currently enrolled in parenting classes at Mount Sinai Hospital; she had finished 18 of the 26 classes she was required to participate in; and she participated in three drug tests, the first in January 1996, which was not done at the request of DCFS, and in which respondent chose the time to provide the urine sample. Respondent also stated that she visited M.Z. once a week, and if M.Z. were to return home, respondent's mother would quit her job to care for M.Z. during the day when respondent was at work. Respondent also stated that she was currently unemployed. Respondent further testified that on her last visit with M.Z., he stated that he did not want to be near her because his grandmother told him not to speak with her. Florentino Guerrero, respondent's sister, then testified that respondent did not use drugs, and that she would be willing to care for M.Z. if respondent had to go to work.
After closing arguments, the trial court issued its findings. The court stated that respondent's psychological report was an important factor in respondent's evaluation. The court further stated that the report showed respondent had "a full scale IQ score of 75," which indicated a "borderline" score, but that respondent's I.Q. score was "not necessarily something that [was] going to reflect one way or the other on [respondent's] * * * ability to parent." The court also stated that evidence of respondent's relationship with M.Z.'s father, who was dealing drugs, "may bear on Mother's ability to make informed decisions." The trial court further stated that the evidence showed that M.Z. had been left alone in the apartment, and respondent was responsible for his care, and that parenting classes were "necessary for [the] Mother under the circumstances." The trial court also stated that "[a]t the trial, there was not a finding that [respondent] had a current drug problem," but noticed that two of the three drug tests that respondent participated in were unreliable because respondent selected the date of the first test, the second test also was not random, and the results from the third test were not reported yet. The trial court then stated that respondent should continue to participate in random drug testing. The trial court also ruled that M.Z. should not be returned to respondent's custody, and that temporary custody was terminated and M.Z. would be placed in the guardianship of the DCFS guardianship administrator. The trial court also denied "supervised or unsupervised" visitation by respondent until further information revealed that respondent was capable of making informed decisions about M.Z. The trial court further found that pursuant to section 2-27 of the Act (705 ILCS 405/2-27 (West 1996)), respondent was unable to "care for, protect, train and discipline" M.Z. This appeal followed.
On appeal, respondent first contends that the trial court's finding she neglected M.Z. was against the manifest weight of the evidence because a finding of neglect "must rest on a showing that the responsible parent either knew or reasonably should have known that the arranged plan of care was inadequate," and she had no reason to know that the appointed caregiver, her adult sister, would leave M.Z. unattended. The State argues that it proved by a preponderance of the evidence that M.Z. was a neglected minor *43 by showing that he was "left unattended for at least two hours."
A trial court's determination that a parent has neglected her or his child is entitled to great deference on appeal and will not be overturned unless the findings of fact are against the manifest weight of the evidence (In re D.M., 258 Ill.App.3d 669, 672, 197 Ill.Dec. 338, 631 N.E.2d 341 (1994)), i.e., where the record demonstrates that the proper result is the one opposite that reached by the trial court (In re T.B., 215 Ill.App.3d 1059, 1062, 158 Ill.Dec. 780, 574 N.E.2d 893 (1991)). "This standard of review recognizes that the trial court is in a much better position than is this court to observe the witnesses, assess credibility, and weigh the evidence." In re T.B., 215 Ill. App.3d at 1062, 158 Ill.Dec. 780, 574 N.E.2d 893. The State bears the burden of proving neglect by a preponderance of the evidence. In re M.K., 271 Ill.App.3d 820, 826, 208 Ill. Dec. 242, 649 N.E.2d 74 (1995).
Section 2-3 of the Juvenile Court Act provides, in pertinent part:
"(1) Those who are neglected include:
(a) any minor under 18 years of age who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parents or other person responsible for the minor's welfare, except that a minor shall not be considered neglected for the sole reason that the minor's parent or other person responsible for the minor's welfare has left the minor in the care of an adult relative for any period of time; or
(b) any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3 (West Supp.1997).
While the concept of neglect can be difficult to define, "[i]n general, `neglect' is the failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty." In re M.K., 271 Ill.App.3d at 826, 208 Ill.Dec. 242, 649 N.E.2d 74. "Neglect," however, is not fixed in its definition. In re Walter B., 227 Ill.App.3d 746, 755, 169 Ill.Dec. 787, 592 N.E.2d 274 (1992). "Cases involving an adjudication of neglect and wardship are sui generis, and each case must ultimately be decided on the basis of its own particular facts." In re Edricka C., 276 Ill.App.3d 18, 25, 212 Ill.Dec. 383, 657 N.E.2d 78 (1995). "`[I]njurious environment' is an amorphous concept which cannot be defined with particularity; therefore, each case should be reviewed considering the specific circumstances of that case." In re M.K., 271 Ill.App.3d at 826, 208 Ill.Dec. 242, 649 N.E.2d 74.
We first observe that while both parties state the well settled rule that "`neglect' is the failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty" (In re M.K., 271 Ill.App.3d at 826, 208 Ill.Dec. 242, 649 N.E.2d 74), neither party specifies upon which basis the issue of respondent's failure to provide an adequate care plan falls underwilful or unintentional. Respondent, in fact, focused her argument, in her appellate brief and during oral argument before this court, on the standard of review in determining whether she neglected M.Z., i.e., whether she knew or reasonably should have known that M.Z. would be left alone by her sister, thereby requiring a "showing" of knowledge on her part.
The State contends that the main fact that M.Z. was allegedly left alone for two hours, without any consideration of whether his being left alone was a result of respondent's wilful or unintentional disregard of her parental duty, was sufficient proof that he was neglected. Also, according to the State, respondent "characterize[`s] her conduct as unintentional," but the State argues that nevertheless "respondent neglected [M.Z.] * * * by failing to provide an adequate plan of care for him." The State further argues that "[e]ven assuming, arguendo, that the `knew or should have known' standard applies in this case, and that the events of October 5, 1996, transpired just as respondent and her babysitter claimed that they did, respondent either knew or should have known that her *44 babysitter would leave Marcos alone in the apartment." Alternatively, the State argues that respondent unintentionally disregarded her parental duty, based on its interpretation of In re R.M., 283 Ill.App.3d 469,219 Ill.Dec. 149, 670 N.E.2d 827 (1996), as discussed below, and that respondent is in effect per se guilty of neglect of M.Z., thus requiring no showing whether she knew or should have known her sister would leave M.Z. alone. In so doing, the State appears to associate that part of respondent's argument here, that there must be a showing that she should have known that her sister would leave M.Z. alone, with an unintentional disregard of her parental duty.
While respondent directs this court to cases in which evidence was presented of a parent's wilful disregard of her parental duty (In re M.K., 271 Ill.App.3d 820, 208 Ill.Dec. 242, 649 N.E.2d 74; In re Walter B., 227 Ill.App.3d 746, 169 Ill.Dec. 787, 592 N.E.2d 274), other than In re R.M., neither party directs this court to any case law specifically addressing an interpretation of unintentional disregard, nor has our research revealed any.[1] In In re R.M., the respondent left her child in her father's care while she was in the hospital, the respondent's father, allegedly without the respondent's knowledge, then left the child with his girlfriend, the girlfriend telephoned the respondent at the hospital demanding money for babysitting, the respondent told her she had no money, and the girlfriend then left the child at a police station. The trial court made a finding of neglect for lack of care. On appeal, the respondent argued that the trial court's finding that she neglected her child was against the manifest weight of the evidence because she was unaware that her father would give her child to his girlfriend. The In re R.M. court recited the rule that "neglect includes both willful and unintentional disregard of parental duties"[2] and stated that, contrary to the respondent's contention, "a neglect determination encompasses more than merely the knowledge and control of respondent," which the court followed with its conclusion that the respondent's father was an "unsuitable caregiver," and that the respondent "did not find an appropriate caregiver," which resulted in the child being abandoned. In re R.M., 283 Ill.App.3d at 471, 219 Ill.Dec. 149, 670 N.E.2d 827. The court did not make a finding that the respondent knew or should have known that her father was an unsuitable caregiver or explicitly state that respondent's action in giving her child to her father constituted an unintentional disregard of her parental duties; the court merely concluded that the father was unsuitable based on the fact that he gave the respondent's child to his girlfriend and would not explain why he did so because he did not want to get her into trouble.
The State maintains, therefore, that In re R.M. "specifically deals with unintentional disregard of parental duties," and that no evidence need be presented to show a respondent's unintentional disregard of parental duties. More specifically, the State contends that "parents [are] liable for the actions of their chosen babysitter and the parents can not [sic] escape a finding of neglect by simply stating they were unaware that the babysitter would not provide adequate care."
While the State responded during oral argument that its interpretation of In re R.M., which we believe it interprets as a per se neglect finding regarding parents who leave their children with an unsuitable caregiver (babysitter), need not "slip down that slope" with respect to parents being charged with neglect as a result of a mishap occurring to their children who are under the care of personnel of day care centers or schools, we *45 believe the State's interpretation of In re R.M. could in fact be equally applied to those parents who otherwise exercised every reasonable effort as circumstances justly demand in choosing the day care center or school their children would attend. In any event, we disagree with the State's interpretation of In re R.M., and respectfully disagree with the In re R.M. court's decision if that court intended such a broad interpretation because to follow it would contradict case law that where a parent is charged with the neglect of her child, each case is to be decided on a case by case basis and its particular facts (In re Edricka C., 276 Ill. App.3d at 25, 212 Ill.Dec. 383, 657 N.E.2d 78), and the State must prove neglect by a preponderance of the evidence (In re M.K., 271 Ill.App.3d at 826, 208 Ill.Dec. 242, 649 N.E.2d 74). Based on this well settled law, we see no reason why the State should not have to prove a respondent's neglect of her child based upon an unintentional disregard of her parental duties or, as respondent here argues that there must be a "showing" whether she "knew or should have known" that her selected babysitter was an unsuitable caregiver, as it must where the respondent is alleged to have wilfully disregarded her parental duties.
Our conclusion is also based on People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769 (1952), in which the rule, that neglect is generally viewed as a failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty, originated, and In re Stilley, 37 Ill.App.3d 193, 345 N.E.2d 777 (1976) (Stilley I), In re Stilley, 66 Ill.2d 515, 6 Ill.Dec. 873, 363 N.E.2d 820 (1977) (Stilley II), and In re S.D., 220 Ill.App.3d 498, 163 Ill.Dec. 207, 581 N.E.2d 158 (1991), all of which, like the In re R.M. court, recognized the rule in rendering their decisions. In Wallace, a petition was filed alleging that the minor's parents were unwilling to care for and protect their child by refusing to consent to a blood transfusion for the child, who suffered from a blood disease. The parents' refusal was based on religious grounds. Three doctors testified that although there was a risk associated with human error, that risk could be eliminated by properly conducting the transfusion. The parents each testified as to the religious bases for their refusal to consent to the transfusion. At the conclusion of the evidence, the trial court appointed a guardian for the child and directed him to consent to the transfusion, which was subsequently administered, the guardian discharged and the child returned to her parents.
On appeal, the parents argued that the trial court lacked jurisdiction to order the transfusion because their child was not a neglected or dependent child within the meaning of the Juvenile Court Act (Act) (Ill. Rev.Stat.1949, ch. 23, §§ 190-220), and their refusal to consent to the transfusion did not show neglect or a lack of parental care. In affirming the trial court, the Wallace court relied on the Act, "which expressly authorizes the court, if circumstances warrant, to remove the child from the custody of the parents," and defined a neglected or dependent child "as one which `has not proper parental care.'" 411 Ill. at 624, 104 N.E.2d 769. The Wallace court further reasoned that, contrary to the respondents' argument, "[n]eglect * * * is the failure to exercise the care that the circumstances justly demand" and "[i]t embraces wilful as well as unintentional disregard of duty," "[i]t takes its content from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Emphasis added.) 411 Ill. at 624, 104 N.E.2d 769. While the Wallace court recognized that there was no suggestion of any improper conduct on the part of the respondents except their refusal to consent to the blood transfusion, it concluded that it entertained no doubt that the child's parents were "deliberately depriving" the child of life or subjecting the child to permanent mental impairment and, as such, the child "was a neglected child within the meaning of the statute." 411 Ill. at 624, 104 N.E.2d 769.
In Stilley I, the State filed a petition for adjudication of wardship of Faith Stilley, asserting that she was neglected based on the fact that she had been found wandering the streets at 11 p.m., she was repeatedly left in the custody of neighbors by her mother and her mother failed to return for her in a *46 reasonable length of time, she was subjected to physical abuse, either intentionally or through gross negligence, her mother was mentally and emotionally incompetent to care for her because she suffered from anxiety and depression causing her to be hospitalized on two occasions and because she was addicted to narcotics and alcohol, and Faith was emotionally disturbed and neither her mother or father could provide the necessary care to deal with her disturbance. At trial, evidence was also introduced that the respondent had engaged in acts of prostitution.
The testimony at trial further established that Faith's mother arranged for Faith's nursery school bus to bring her to her great-grandmother's house, where she planned to pick Faith up later that night, Faith was delivered to the house, she later slipped out of the house and was found by the police. When the respondent arrived at the house, she discovered Faith was not there and, because she could not understand her grandmother, who spoke Polish, she assumed that her relatives who lived across the street, had taken Faith home. The respondent waited until the next morning before making further inquiry, and then contacted the police. The evidence further showed that the respondent's grandmother was an able babysitter and had cared for Faith on several occasions. Evidence was also presented that the respondent had left Faith with a babysitter one evening and when she returned she discovered that Faith had burns on her feet and Faith's natural father was with her. At that time Faith was placed in a foster home and subsequently returned to the respondent. Evidence was further introduced as to the remaining allegations of neglect against the respondent. The Stilley I court found that the evidence did not support the trial court's finding of neglect. On appeal to our supreme court, the Stilley II court reversed the Stilley I court, concluding that the trial court was able to observe the parties and witnesses and found more credence in the testimony of the State's witnesses than in the respondent's. Accordingly, the Stilley II court held that "the trial court's decision was not palpably erroneous, nor against the manifest weight of the evidence." Stilley II, 66 Ill.2d at 521, 6 Ill.Dec. 873, 363 N.E.2d 820.
In In re S.D., following an adjudicatory hearing, the trial court dismissed a petition for adjudication of S.D., a minor, which alleged that he was neglected based on an injurious environment. Testimony at trial revealed that Z.D., S.D.'s sister, had been sexually abused by her stepfather and S.D. was living in the same home where the abuse had been taking place. The evidence also established that the respondent, who was a certified nurse's assistant, had often been told by her mother that she was suspicious that the respondent's husband was sexually abusing Z.D., the respondent had taken Z.D. to a doctor after the respondent had noticed Z.D.'s behavior had significantly changed, and that Z.D. would not allow the doctor to examine her. The trial court found that the respondent's claim that she was "unaware of the situation" was "absolutely incredible." 220 Ill.App.3d at 501, 163 Ill.Dec. 207, 581 N.E.2d 158. Although the court found that S.D.'s sister was abused and neglected, the trial court found no showing that S.D. had been neglected apart from the abuse and neglect directed at his sister. On appeal, the public guardian argued that the trial court erred in failing to enter a finding of abuse. In reversing the trial court, the In re S.D. court relied on the trial court's specific findings, that:
"`Now, mother's defense is that she did not know. I mean the evidence indicates to me that either she knew or reasonably should have known that this child was being sexually abused. Grandmother told her repeatedly. [S.D.] told grandmother.
I think he [S.D.] may have even also told mother, and yet, mother indicates that she had absolutely no knowledge that this two year old child is being sexually abused over the months by mother's husband.
I find that absolutely incredible.'" In re S.D., 220 Ill.App.3d at 504, 163 Ill.Dec. 207, 581 N.E.2d 158.
The In re S.D. court then concluded that "[t]he circuit court did find that a prima facie case of both abuse and neglect by a preponderance of the greater weight of the evidence had been established" (220 Ill. App.3d at 504, 163 Ill.Dec. 207, 581 N.E.2d *47 158) and, therefore, the circuit court's decision was contrary to the manifest weight of the evidence.
There is no suggestion in Wallace, Stilley I, Stilley II or In re S.D. that the standard of proof by a preponderance of the evidence is not required for an allegation of neglect based on unintentional disregard of parental duties or that a per se neglect finding is to be applied. Those courts clearly considered all the "surrounding circumstances" (Wallace, 411 Ill. at 624, 104 N.E.2d 769), based on all the evidence presented, in making their decisions of whether the respondents in those cases were neglectful of their children, without explicitly stating that the parent's conduct fell under wilful or unintentional disregard, and rendered their decisions based upon the preponderance of the evidence. Therefore, we conclude that the focus in neglect cases is on the circumstances and evidence presented in support thereof in making a neglect finding, not the particular, but necessary, wilful or unintentional "designations," which obviously are intended to provide the broadest protection for children, and is in conformance with the well settled law that each neglect case must be decided on its own particular facts and the State must prove neglect by a preponderance of the evidence in each case.
We further observe that the State's argument, that no "knew or should have known" standard exists, as respondent argues, is contradicted by the In re S.D. court's consideration of a similar argument in that case, in which that court quoted the trial court in considering a "knew or should have known" argument as the basis for reversing the trial court's dismissal of the petition for the adjudication of wardship of S.D. Additionally, the initial basis prompting a charge of neglect against the respondent in Stilley I was due to the minor being found wandering the streets alone, having "slipped out" of her babysitter's house and, nevertheless, the Stilley I and Stilley II courts did not apply a per se neglect rule as to that apparent "unintentionally" based incident, but rather considered all the evidence and the preponderance of that evidence as to all the incidents alleged against the respondent in determining whether the child was neglected. Accordingly, we find that any allegation of unintentional disregard based on a babysitter's inappropriateness as a caregiver cannot be deemed per se neglect; the State must prove by a preponderance of the evidence the neglect charged, whether based on allegations of wilful or unintentional disregard of parental duty.
As to the merits of the present case, we are unable to address them because the trial court failed to state in writing or otherwise the factual basis for its findings of abuse or neglect at the adjudicatory hearing, as required by section 2-21 of the Act, which provides that "[t]he court's determination of whether the minor is abused, neglected, or dependent shall be stated in writing with the factual basis supporting that determination." 705 ILCS 405/2-21(1) (West 1996). The trial court's findings are recorded only in its form order and in brief statements in the record. In its order, the court checked box number 7119, which states, "2. [the court finds that the minor is] abused or neglected as defined in 405/2-3 of the Juvenile Court Act in that conduct toward the minor violates:"; box number 7109, which states, "405/2-3(1)(a) lack of care"; box number 7110, which states, "405/2-3(1)(b) injurious environment"; and an unnumbered box, which states, "[the abuse or neglect of the minor] is not the result of physical abuse inflicted by a parent, guardian or legal custodian of the minor." The record contains the following statements:
"THE COURT: * * * I have had the occasion to hear the testimony of the witnesses * * *, and the Court certainly having the opportunity to weigh the weight and sufficiency of their testimony.
* * *
* * * Let the record reflect the Court will make the following findings: I will find neglect with a violation of * * * Section 405/2-3 thereof in that conduct concerning the minor, Marcos, this young child * * * violates specifically Subsection 1(A) [sic], that being neglect, lack are [sic] of care.

*48 I will further find a violation of Subsection 2-31(B) [sic] that being neglect, injurious environment.
As to the remaining allegations, those allegations being physical abuse, substantial risk of physical injury as well as excessive corporal punishment, this Court will not make findings as to any of those. That certainly was not proved by the State by a simple preponderance of the evidence.
I will certainly find, since the statute does require that I make that finding, * * * that any neglect or abuse of the minor is not the result of physical abuse."
Based on the foregoing, while the trial court weighed the evidence against respondent, we cannot know what facts the court relied upon in making its findings, which clearly pertained to respondent's October 5, 1995, plan of care for M.Z. and, therefore, we cannot determine whether its findings were against the manifest weight of the evidence. Additionally, because the same incident was considered as one of the factors by the court in making its finding at respondent's dispositional hearing that respondent was unable to care for M.Z., we similarly cannot address respondent's argument that the trial court's finding was against the manifest weight of the evidence. Accordingly, we must remand this cause to the trial court, with directions that the court state the factual bases for its findings.
Remanded, with directions.
McNAMARA and WOLFSON, JJ., concur.
NOTES
[1] "Wilful or unintentional disregard of parental duty" does not appear in the statute at issue here.
[2] The In re R.M. court cited to In re Ashley F., 265 Ill.App.3d 419, 202 Ill.Dec. 722, 638 N.E.2d 368 (1994), in which the In re Ashley F. court found that while a prima facie case had been established that the respondent had neglected her two-month-old infant, who had rolled off a bed and fractured her skull, the prima facie case was overcome by the public guardian's failure to establish that the child's injuries could not have been sustained except by the actions or omissions of the respondent. The In re Ashley F. court, however, merely recited the wilful or unintentional disregard of parental duty rule without discussing any specific application of that rule to the case.