**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180737-U

Order filed February 11, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* M.R., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| a Minor | ) | Peoria County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-18-0737 |
| | ) | Circuit No. 18-JA-21 |
| v. | ) | |
| | ) | |
| T.R., | ) | |
| | ) | Honorable David A. Brown, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Carter and McDade concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding the minor child neglected by reason of an environment injurious to her welfare under a theory of anticipatory neglect following credible allegations of respondent sexually abusing his niece and stepdaughter.

¶ 2    In January 2018, the State filed a petition for wardship of M.R., a 14-year-old minor female.

The petition alleged that respondent, T.R., neglected M.R. by reason of an environment injurious

to the minor's welfare. The State presented the court with a theory of anticipatory neglect after M.R.'s minor cousin, 14-year-old W.S., reported that respondent sexually abused W.S. The State also presented testimony from N.B., M.R.'s half-sister, who alleged respondent sexually abused her when she was 13. The court found that M.R. was neglected by reason of an injurious environment because of respondent's sexual abuse of W.S. and N.B., two minor females that respondent abused when they were M.R.'s age.

¶ 3                                    I. BACKGROUND

¶ 4        In January 2018, the State filed a single-count petition alleging that M.R. was neglected due to an injurious environment. 705 ILCS 405/2-3 (West 2016). The petition alleged that on October 2, 2017, respondent sexually abused W.S., M.R.'s 14-year-old cousin. Specifically, W.S. accused respondent of touching her breasts and vagina, exposing himself to her, and asking her to touch or suck his penis. M.R.'s half-sister, N.B. (respondent's stepdaughter), came forward and accused respondent of the same behavior against her when she was 13. For these reasons, the State believed M.R. was neglected due to an injurious environment under a theory of anticipatory neglect.

¶ 5        On July 13, 2018, the matter proceeded to an adjudicatory hearing. The court allowed W.S. to testify *in camera*. W.S. testified that respondent drove her home after a football game on October 2, 2017. It was dark out and respondent pulled over on a gravel road. W.S. switched places with respondent to drive his truck. She alleged that respondent began fondling her breasts under her bra and her vagina under her pants. W.S. told respondent to stop and tried to push his hand away. Respondent told her to pull over so he could drive. While driving, respondent began masturbating.

¶ 6    When W.S. arrived at respondent's home, her mother and C.R. (M.R.'s mother and respondent's wife) asked her what was wrong. She told them and left with her mother. C.R. called the police to report the incident.

¶ 7    M.R. and W.S. were friends before this incident. After W.S. reported her allegations about respondent, M.R. began sending W.S. text messages asking W.S. to recant her story. W.S. replied to M.R., claiming she lied about what happened. W.S. testified that she did this in order to maintain her friendship with M.R. but that respondent had, in fact, sexually abused her.

¶ 8    M.R.'s 31-year-old half-sister, N.B., also testified. When she was 13, respondent took her fishing. They stayed in a camper on the lake. Respondent asked N.B. to rub his back, which she did. She described an incident similar to what W.S. alleged happened to her, including direct contact with her breasts and vagina, as well as exposing himself to her. Counsel for respondent highlighted inconsistencies in N.B.'s testimony. She claimed that she did not bring the incident to her mother until two years later after an argument with C.R. so that she could live with her father instead. N.B. alleged that this was the only instance of inappropriate contact between her and respondent. She eventually moved back into respondent and C.R.'s home. N.B. allowed C.R. and respondent to watch her children many times until October 2, 2017, when C.R. called her and told her "he did it again." N.B. came over immediately after hearing what W.S. experienced.

¶ 9    Joe Vissering, a Peoria County sheriff's detective, testified that he spoke with W.S. on October 4, 2017. W.S. told him that respondent pulled over his truck while driving, asked her to change seats so she could drive, and began touching her breasts and vagina. W.S. pulled over, respondent resumed driving and began masturbating, asking W.S. to touch and suck his penis.

¶ 10    Vissering also spoke to C.R. She reported that when W.S. returned, her mascara was smeared and she looked as if she had been crying. C.R. followed W.S. upstairs and asked what

was wrong. W.S. told C.R. that respondent touched her breasts and vagina under her clothes. She told Vissering that she believed W.S. because of similar allegations N.B. made.

¶ 11    On October 12, 2017, Vissering spoke to respondent. He claimed that nothing inappropriate happened on the drive home on October 2. Respondent claimed he scolded W.S. because M.R. told him W.S. sent nude pictures of herself. Respondent said C.R. never confronted him but, instead, immediately called the police. Respondent quickly left the home. He also denied ever having sexual contact with N.B.

¶ 12    Vissering reinterviewed W.S. in January 2018. He asked her about the inconsistent text messages she sent M.R. W.S. admitted to sending the messages but averred that she lied to M.R. to protect their friendship. W.S. reaffirmed the original statement she made to Vissering.

¶ 13    Jana Anderson, an investigator for the Department of Children and Family Services (DCFS), testified that she spoke with C.R. the day after the incident. C.R. said she had a safety plan in place so that respondent would have no contact with M.R. C.R. told Anderson about N.B.'s allegations. This caused her to believe W.R. instantly when she reported what had occurred in the truck.

¶ 14    Anderson, again, visited M.R. and C.R. later in October. M.R. has diabetes and respondent was usually responsible for providing transportation to her medical appointments. C.R. wanted respondent to return to continue taking M.R. to her appointments. Anderson explained why that was not possible. Ultimately, C.R. remained compliant with the safety plan.

¶ 15    Respondent testified that he did not remember going fishing with N.B. alone. He denied ever touching her inappropriately. He contended that C.R. only told him about N.B.'s allegations after W.S. reported being sexually abused. Respondent conceded that he drove W.S. home on October 2, 2017, but denied pulling over, switching seats, touching W.S., and masturbating. He

- 4 -

only scolded W.S. for sending nude pictures of herself. Respondent left his home when C.R. called the police.

¶ 16       On cross-examination, respondent claimed he did not know why N.B. moved out of their house. He thought it was because of a fight between N.B. and C.R.

¶ 17       M.R. testified that respondent drove W.S. home on October 2, 2017. M.R. previously told respondent that W.S. was sending nude pictures of herself. Respondent was disgusted to learn of W.S.'s behavior.

¶ 18       C.R. testified that W.S. returned home on October 2, 2017, with her mascara smudged. C.R. followed W.S. into M.R.'s room to ask if she was upset. W.S. told C.R. that respondent touched her breasts and vagina underneath her clothes. C.R. went downstairs and told respondent that he would not get away with this again. C.R. maintained that N.B. moved out because she was sneaking out of the house and coming home late. C.R. denied knowing that respondent sexually abused N.B. until October 2, 2017.

¶ 19       The trial court found W.S.'s testimony to be credible as she consistently reaffirmed her version of events multiple times. W.S. provided a reasonable explanation for her inconsistent text messages to M.R. The court rejected respondent's attempt to impeach W.S. by referencing W.S.'s illicit photographs as it provided no motive to lie. The court did not find it necessary to resolve the inconsistencies in N.B.'s allegation against respondent. N.B.'s reaction to the October 2 events was consistent with the notion that respondent sexually abused her in the past. She dropped what she was doing to support W.S. in that moment. The court noted N.B.'s inconsistencies in reporting her sexual abuse, as well as the delayed reporting itself, are consistent with the experiences of many survivors of sexual abuse who do not speak out immediately. Both N.B. and C.R. immediately believed W.S.'s allegation. C.R.'s use of "again" when speaking to N.B. indicated a

pattern of respondent's behavior. The court found that respondent's actions toward W.S. hurt M.R. and her household in significant ways. It damaged a close friendship between M.R. and W.S. It disrupted M.R.'s household and ability to receive the proper medical care. Respondent sexually abused two minor female family members, one of whom was a member of his household, when they were M.R.'s age. Accordingly, the court found M.R. was neglected as a result of an injurious environment created by respondent's actions.

¶ 20                                        II. ANALYSIS

¶ 21        Respondent appeals the trial court's finding that M.R. was neglected because the State admitted no evidence pertaining to respondent's treatment of M.R. He argues that his alleged abuse against W.S. is insufficient to support a finding that M.R. was neglected. The State responds that under its theory of anticipatory neglect, respondent's treatment of another child is probative of how he may treat his own.

¶ 22        The Juvenile Court Act of 1987 (Act) provides a set of procedures to ensure the best interests of a child are being served. 705 ILCS 405/1-2. (West 2016). After the State files a petition for wardship, the trial court "must make a finding of abuse, neglect or dependence before it conducts an adjudication of wardship." *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). The Act defines a "neglected minor" as "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2016). "Neglect" necessarily has a fluid meaning; it cannot be limited to a narrow set of circumstances. *In re Arthur H.*, 212 Ill. 2d at 463.

¶ 23        The term "injurious environment" also has a nonfixed meaning; it cannot be narrowly defined. *In re N.B.*, 191 Ill. 2d 338, 346 (2000). Our supreme court has provided the general guidelines to describe an injurious environment, including "the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.*

¶ 24    Cases under the Act are *sui generis*; they require examination of the unique circumstances on a case-by-case basis. *In re Arthur H.*, 212 Ill. 2d at 463. The State carries the burden of proving allegations of neglect by a preponderance of the evidence. *In re Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002). We will not reverse a trial court's ruling of neglect unless it is against the manifest weight of the evidence. *In the Interest of M.Z.*, 294 Ill. App. 3d 581, 592 (1998). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Edward T.*, 343 Ill. App. 3d 778, 794 (2003). The driving force in any proceeding under the Act is the best interests of the child. *In the Interest of K.G.*, 288 Ill. App. 3d 728, 734-35 (1997). The trial court has wide latitude to determine the child's best interests "because it has the best opportunity to observe the witnesses' testimony, assess credibility, and weigh the evidence." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 27.

¶ 25    Although the trial court is tasked with determining whether a child was neglected, not whether the parents were neglectful, this does not diminish the importance of the theory of anticipatory neglect. *Arthur H.*, 212 Ill. 2d at 478.

> "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *Id.* at 468.

"[T]he juvenile court should not be forced to refrain from taking action until each particular child suffers an injury." *In the Interest of Brooks*, 63 Ill. App. 3d 328, 339 (1978). Section 2-18(3) of the Act provides that proof of neglect of one minor "shall be admissible evidence" at a hearing on the issue of neglect of another minor for whom the respondent is responsible. 705 ILCS 405/2-

18(3) (West 2016). However, "the mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor." *Arthur H.*, 212 Ill. 2d at 468.

¶ 26    The State argues that it satisfied its burden of proof by showing that respondent had committed sexual abuse against W.S., a family member of similar age to M.R, and N.B., M.R.'s half-sister. We agree. W.S. provided a detailed, consistent account of how she alleges respondent sexually abused her. She told her mother and C.R. what happened immediately after the incident. C.R. instantly believed W.S. and elected to call the police immediately without speaking to respondent, her husband, about W.S.'s version of events. N.B. recounted a very similar experience with respondent. Although the details were murky as the alleged abuse occurred almost 20 years prior, her details of respondent's behavior are consistent with what W.S. reported. N.B. felt so strongly about what happened to her that she came over immediately after C.R. called to say that respondent had done it "again." Despite respondent's efforts to highlight N.B.'s inconsistencies in reporting, the court found her credible based on the totality of the circumstances. W.S. was consistent in her reporting; the court found her credible. The only inconsistency was with what she told M.R. about what happened after their friendship was damaged and M.R. asked her to recant her previous statements. W.S. explained to Vissering and the court that she lied to M.R. to regain their friendship. The court found this explanation reasonable. In all other settings, W.S. was consistent in her description of how the night of October 2 unfolded. The court's credibility findings were not against the manifest weight of the evidence, as it was in the best position to assess the veracity of the witnesses' statements; the State presented the court with respondent's alleged history of sexual abuse and a consistent account of abuse against W.S and N.B. The court's finding that M.R.'s environment was injurious to her under a theory that M.R. faced the possibility of sexual abuse by respondent, a man who is alleged to have sexually abused two related females

who were M.R.'s age at the time of the abuse, was not against the manifest weight of the evidence. This is the type of situation for which the theory of anticipatory neglect was designed. See *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 21. The court's determinations were wholly proper based on the circumstances.

¶ 27                                        III. CONCLUSION

¶ 28            For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 29            Affirmed.