*In re* A.H., a Minor (D. Jean Ortega-Piron, Guardianship Administrator of the Department of Children and Family Services, Appellant).

First District (2nd Division)   No. 1—99—0656

Opinion filed March 28, 2000.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Patrick W. Carlson, Assistant Attorney General, of counsel), for appellant.

Patrick T. Murphy, Public Guardian, of Chicago (Ron Fritsch, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

Appellant D. Jean Ortega-Piron, guardianship administrator of the Department of Children and Family Services (DCFS), appeals from a juvenile court order requiring her to remove A.H., a minor child under her temporary custody, from the nonrelative foster home of Margie B. The juvenile court order, which was issued over the objections of DCFS, the Cook County State's Attorney, and the foster mother's court-appointed attorney, came in response to an oral emergency motion by the minor's guardian *ad litem* seeking removal of A.H. from the foster home. Ortega-Piron, the DCFS guardianship administrator, then filed this appeal. For the reasons set forth below, we reverse the juvenile court's order.

## BACKGROUND FACTS

On or about October 19, 1998, Linda H., the mother of A.H., her (then) nine-year-old son, called the DCFS hotline asking that A.H. be removed from her home before she killed him. On October 20, the Cook County State's Attorney filed a petition for adjudication of wardship with the juvenile court pursuant to section 2—13 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2—13 (West 1998)). The petition alleges child abuse and neglect pursuant to section 2—3 of the Juvenile Court Act (705 ILCS 405/2—3(1)(b), (2)(ii) (West 1998)). The petition also alleges that the child was taken into custody at 7:05 p.m. October 19, 1998, and that a temporary custody hearing was set for October 21 before the juvenile court.[1] The State's Attorney also moved that Ortega-Piron be named temporary custodian

---

[1] Under section 2—9 of the Juvenile Court Act, where a minor is taken into temporary protective custody, he must be brought before a judicial officer within 48 hours for a temporary custody hearing (unless he is released before that deadline). 705 ILCS 405/2—9(1) (West 1998).

of A.H. On October 21, 1998, the juvenile court entered a temporary-custody-hearing order pursuant to section 2—10 of the Juvenile Court Act (705 ILCS 405/2—10 (West 1998)). That order provided that A.H. be removed from Linda H.'s home and that temporary custody of the child be granted to Ortega-Piron, the DCFS guardianship administrator, with the right to place him. Also on October 21, the Cook County public defender was named attorney for Linda H., and the Cook County public guardian was named guardian *ad litem* (GAL) for the minor. In October 1998 A.H. was placed in the foster home of Margie B. The next hearing in the case was scheduled for December 11, 1998, but it was continued to January 19, 1999.

On December 30, 1998, Linda H. called the DCFS hotline and reported that her son indicated he was being beaten by Margie B.'s 11-year-old grandson, who occasionally visited the home. Linda H. reported that she observed cuts, welts and bruises on her son, and a swollen left eye. The telephone call was reported by DCFS in an "Unusual Incident Report" (UIR) dated January 5, 1999. The report was received by the GAL on January 6 and was introduced into evidence by the GAL two weeks later at the hearing previously scheduled in the petition for wardship under section 2—13 of the Juvenile Court Act.

That hearing was convened on January 19, 1999. It began with a "court family conference" in which the juvenile court reviewed the services to be provided for Linda H., including psychological evaluation and counseling. Between December 30, 1998, and the January 19 hearing, no motion was made to remove A.H. from Margie B.'s foster home and no attempt was made to initiate any proceeding for removal of the child with DCFS (the DCFS service appeal process). However, at the January 19 hearing the GAL made an oral emergency motion (off the record) seeking removal of A.H. from the foster home because of allegations of physical abuse. The DCFS counsel objected to going forward on an emergency basis where the incident was reported nearly three weeks previously and the GAL knew of it two weeks prior to the hearing. The DCFS counsel noted that the foster parent had not been given notice as required under sections 2—9(2) and 1—5(2) of the Juvenile Court Act (705 ILCS 405/2—9(2), 1—5(2)(a) (West 1998)), and that no effort had been made to give her notice. The DCFS counsel asked that the motion be held over until the next day so a petition could be filed and notice could be given. DCFS also asserted that the court must first determine that there is an emergency before proceeding. The assistant State's Attorney (ASA) asked for an offer of proof to show that there was in fact an emergency, but the GAL said she did not think such an offer was appropriate. The juvenile court then continued the motion to January 20, the next day.

However, later on January 19, 1999, the court recalled the case to hear testimony from Linda H., who according to the public defender was unable to attend the next day because of a work conflict. The ASA again asked for an offer of proof to establish that there was an emergency, and the GAL stated there were photographs showing bruises, scratches and bite marks on the minor's arms, torso and head. She added that she was not convinced the perpetrator had been identified and that "a grandson who is still visiting the home" and a 19-year-old baby-sitter "who was sleeping when the incident occurred" still had access to A.H. The DCFS counsel stated that a DCFS Division of Child Protection (DCP) investigator had visited A.H. December 31, 1998, and that A.H. identified the 11-year-old grandson as the one who fights with him. DCFS counsel represented that a protective plan was in place barring the grandson from being in the home when Margie B. was not there. Further, DCFS averred that a DCP investigator had identified the 19-year-old baby-sitter as the alleged perpetrator.

The juvenile court then immediately proceeded to hear the testimony of Linda H., called as a witness by the GAL. Linda H. testified that she had visited her son on December 30 at the home of Ms. Davis, the person who regularly babysat A.H. when Margie B. was away. Linda H. said she noticed her son's left eye was swollen and that it looked like a black eye, and she asked him what happened. He initially said he "slept on it," but she suspected he was not telling the truth and asked him again what happened. He replied that the foster mother's grandson did it. Linda H. testified further that she took pictures of her son on that day and that they showed his swollen eye and a scratch on his back. The photos, which were introduced into evidence by the GAL, also showed a long scratch across his chest, a small bruise under his right nipple, and what looked like bite marks on his right arm. Linda H. stated that A.H. told her the incidents happened during Christmas break when school was out. He also told her that Tish, a 19-year-old baby-sitter, was present at the time but was asleep. He said Tish is the person who watches him when Margie B. is at work and the regular baby-sitter (Ms. Davis) is unavailable. He also told Linda H. he had not told anybody about the fights. Linda H. also stated that A.H. told her he wanted to leave that foster home and that the grandson was the reason. Two other foster children were in the home, but he never indicated he had any problems with those children.

According to Linda H., she next saw her son on January 6 and saw no new marks or bruises, and the black eye was gone. A.H. again told her on the 6th that he wanted to leave the foster home. This time he added that he was "scared." He also told his mother that Margie B.

had assured him that her grandson would not be allowed near him unsupervised.

On cross-examination, Linda H. conceded that she did not believe Margie B. was involved in this, and she felt Margie B. had made a good choice in picking Davis as the baby-sitter. She added that her main concern was that A.H. be with her family, with relatives.

Immediately following the testimony of Linda H. on January 19, the court called Jonester Edwards, a Central Baptist caseworker, as its own witness. Edwards testified she spoke to the foster mother by telephone on January 6, 1999, and that Margie B. told her the DCP investigator had talked to her. According to Edwards, Margie B. was upset that DCP had been called and that neither A.H. nor Linda H. had told her about the fights. Edwards spoke to the foster mother later the same day, and she told Edwards that she did not know about the fights, that the two boys were about the same age, and that she saw no indication of a black eye. Margie B. also told Edwards A.H. had set the bed on fire, that he was a bed-wetter, and that he was not happy in her home. The court then continued the matter until the next day and directed DCFS to notify the foster parent.

On January 20, 1999, the hearing was reconvened with the foster mother present. The court appointed counsel for the foster mother and granted her intervener status and also summarized the previous testimony from the day before. Edwards then testified on cross-examination that she first learned of the A.H. incident on January 6, and she went to see the child on January 13. She said that, when she saw A.H., she observed what she called "[o]ld scars" on his chest. A.H. told her the foster mother's grandson had done this to him. She also said Tish was formerly Margie B.'s foster child and lives in the home. Edwards also disclosed that she put an additional protective plan into place, to become effective as of January 20, under which Margie B. agreed not to leave A.H. alone. According to that agreement, when Margie B. left the home, she would take A.H. to Davis' home, and Tish would not ever baby-sit for him. Edwards concluded that Margie B.'s home was a "proper placement" for A.H. and she felt he was safe there.

The GAL next called James Boits, the DCP investigator initially assigned to the A.H. case. Boits testified that he first saw A.H. on December 31, 1998, and that the boy told him Margie B.'s grandson, Norman, beat him up on two or three different occasions in December 1998. A.H. did not say that he had told Margie B. about the fights. Boits said A.H. told him that when Norman visited, he and Norman would be upstairs and Tish, the baby-sitter, would be downstairs. A.H. related that they would get into a fight and Norman would beat him

up and that Tish would not intervene but would merely ask him why he didn't hit Norman back. Boits said that, when he examined A.H., he observed a large, wine-colored stain on the upper part of his chest that looked old, not fresh. He said he was told A.H. was allergic to oranges and that he broke out in hives when he ate them. However, Boits said he thought it unlikely the mark was from hives and he thought it was a bruise. He said he also observed a slight puffiness under A.H.'s eye and small scratches on his back that were scabbed over.

Boits said he talked to the foster mother on January 6, 1999, and she told him she thought A.H. should punch her grandson back when they fought. Boits also testified that Margie B. referred to A.H. as a "pansy" and a "wimp," and that she called him a wimp while A.H. was present, which Boits thought was "a little inappropriate." Boits said when he observed A.H. and Margie B. together, he felt the foster mother's demeanor and attitude seemed "a little bit cold." Boits also testified that Margie B. told him A.H. was "a difficult child to care for," that he had set the house on fire, and that he had a bed-wetting problem. Boits said he felt the foster mother did not have enough "empathy and understanding of [those] behavioral problems" and that she needed more education and counseling in caring for a child with such needs. Boits also testified on cross-examination that the DCP investigation of the incident was still pending.

Notwithstanding the foregoing, Boits said he did not feel A.H. was at risk of physical harm at that point. Boits emphasized that A.H. never indicated it was an adult who physically abused or neglected him, adding that the original report focused on the grandson and A.H. getting into fights. He also noted that a protective plan was in place as of January 6 under which Margie B. assured him that, if the grandson visited again, there would be direct adult supervision by someone other than Tish. Boits said he saw no reason for A.H. to be removed from Margie B.'s home.

DCFS called Margie B., who testified that A.H. was placed in her home in October 1998 and that she first learned of the DCP investigation on December 30 when Davis, the regular baby-sitter, told her. Margie B. said she questioned A.H. about the marks on his chest and he said he got them "around [his] old house where [he] used to live from [his] friends playing around." She also said A.H. told the other foster children in her home that he got the marks when "his mother was trying to kill him." Margie B. said she asked A.H. to explain, and he told her he was at the table with his mother doing homework and "he didn't have it right and she started chasing him around the table with a knife." Margie B. said A.H. never told her anything about a

fight with Norman. She also stated that A.H. ate oranges shortly after Christmas and that his face swelled up and his eyes were puffy and red. On cross-examination, Margie B. denied having referred to A.H. as a "pansy" but said she did use the word "wimp." She also conceded she had complained to Edwards, the Central Baptist caseworker, that A.H. was giving her "a lot of difficulties." Margie B. stated that Tish had not baby-sat with A.H. since December 30, 1998.

At the conclusion of the testimony, the DCFS counsel again objected, noting that the motion was filed as an emergency motion but that the only substantial change since December 30 was that a protective plan was in place to eliminate the possibility that Norman and A.H. would be in the home together. Nevertheless, the judge found that an emergency did exist and that there was probable cause to believe A.H. was "abused and/or neglected within the meaning of the statute." She found that Margie B. was not a credible witness and not a truthteller, and she said she did not think the foster mother could be trusted "to follow any protective plan which would be put in place." The judge stated she believed "to a moral certainty" that Margie B. called A.H. both a pansy and a wimp. The judge found there was immediate and urgent necessity to support the removal of A.H. from the foster home and that reasonable efforts could not prevent or eliminate the necessity of that removal. She also found that the removal of A.H. from the foster home was "consistent with the health, safety and best interest of the minor." Therefore, in an order dated January 22, 1999, the judge ordered Ortega-Piron to remove A.H. from Margie B.'s home. On February 22, 1999, Ortega-Piron filed the instant interlocutory appeal pursuant to Supreme Court Rule 307(a) (166 Ill. 2d R. 307(a)). On appeal, Ortega-Piron argues that the juvenile court's only authority to order a child removed from a foster home comes from the Juvenile Court Act, which authorizes such removal only where a temporary custody hearing is convened and an emergency is found. Ortega-Piron contends there was no such emergency here and that the juvenile court thus lacked authority to sidestep the DCFS administrative service appeal process and order A.H. removed from Margie B.'s foster home. The DCFS guardianship administrator further argues that the juvenile court violated several provisions of the Juvenile Court Act pertaining to temporary custody hearings and that its proceeding therefore was not a valid temporary custody hearing. In addition, Ortega-Piron claims the court's decision that there was immediate and urgent necessity to remove A.H. from the foster home was against the manifest weight of the evidence. Finally, she contends the juvenile court's order violated the separation of powers doctrine.

## ANALYSIS

■ Before addressing the merits of this case, we must first determine whether it is moot. Following the court's January 22 order, DCFS removed A.H. from Margie B.'s foster home. Although the child could be returned to Margie B.'s home, DCFS has stated that in such cases it normally does not return the minor to the foster home and that it has no intention of doing so in the instant case. "An appeal becomes moot where the issues involved in the trial court no longer exist because events occur which render it impossible for the reviewing court to grant effective relief." *In re A.D.W.*, 278 Ill. App. 3d 476, 480, 663 N.E.2d 58, 61 (1996). While it is unlikely that A.H. would be returned by DCFS to the same foster home, it is not literally impossible for that to happen. Thus while it appears from a practical perspective that regardless of the result of this appeal, the child still would not be returned to the foster home, the appeal is nevertheless not moot as a matter of law. *A.D.W.*, 278 Ill. App. 3d at 480, 663 N.E.2d at 61. However, even if it were moot, it would qualify for review because it involves "a question of great public interest." *In re A Minor*, 127 Ill. 2d 247, 257, 537 N.E.2d 292, 296 (1989). Criteria for application of that public interest exception include: "(1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will generally recur." *A Minor*, 127 Ill. 2d at 257, 537 N.E.2d at 296. Those criteria are met in the instant case. First, this case questions the right of a juvenile court to intervene in DCFS foster placement matters, thereby preempting the agency's authority and bypassing the DCFS administrative service appeal process. That is clearly a matter of public concern. *Cf. In re R.M.*, 288 Ill. App. 3d 811, 816, 681 N.E.2d 652, 655 (1997) (issue of whether juvenile court may order child removed from one foster home and placed in another is issue of public concern). Moreover, consonant with the criteria set forth in *A Minor*, it is also desirable to offer some clarification to juvenile court judges as to when and whether such preemptive intervention may take place. In addition, it is likely that this question will recur. *Cf. R.M.*, 288 Ill. App. 3d at 816, 681 N.E.2d at 655. Therefore, the instant case, even if it were otherwise moot, qualifies for review.

■ We turn now to the central issue before us: whether the juvenile court had authority under the Juvenile Court Act to preempt the authority of DCFS on issues involving the removal of a child from his foster home placement. Ortega-Piron (DCFS) argues that DCFS has exclusive jurisdiction over foster placement decisions by virtue of its service appeal process established pursuant to section 5(o) of the Children and Family Services Act (DCFS Act) (20 ILCS 505/5(o) (West Supp. 1997)). Section 5(o) provides:

"The Department shall establish an administrative review and appeal process for children and families who request or receive child welfare services from the Department. \*\*\* An appeal of a decision concerning a change in the placement of a child shall be conducted in an expedited manner." 20 ILCS 505/5(o) (West Supp. 1997).

Under that service appeal process, foster parents and children who receive child welfare services from DCFS are among those who may appeal decisions made by or on behalf of DCFS. 89 Ill. Adm. Code § 337.60 (1995). The process provides for an optional mediation alternative and a fair hearing. 89 Ill. Adm. Code § 337.30 (1995). In addition, a party may request an emergency review, which "allows for an interim decision pending a fair hearing." 89 Ill. Adm. Code § 337.30(b) (1995). Under section 9.9 of the DCFS Act (20 ILCS 505/9.9 (West 1992)), any responsible parent or guardian affected by the administrative decision of DCFS may seek judicial review under the Administrative Review Law (735 ILCS 5/3—101 et seq. (West 1992)). Section 9.9 also states that administrative review is the "exclusive" remedy for appeal of DCFS final administrative decisions and that "no court shall have jurisdiction to review the subject matter of any order made by [DCFS] except as [provided in the Administrative Review Law]." 20 ILCS 505/9.9 (West 1992).

The minor contends that the plain language of section 2—10(2) of the Juvenile Court Act grants blanket authority for the juvenile court to select a child's placement. Under that provision, the minor argues, the juvenile court has authority to order a child kept in a "suitable place" so long as it is "consistent with the health, safety and best interests of the minor." 705 ILCS 405/2—10(2) (West 1998). Thus the court here had authority to order A.H. removed from Margie B.'s foster home, and there was no need for it to find "probable cause" to believe he was abused or neglected or that his removal from the foster home was a matter of "immediate and urgent necessity." DCFS concedes that section 2—10 authorizes the juvenile court to order a child removed from a foster home, but contends that such authority is highly restrictive and given only where there is probable cause to believe the minor was abused or neglected and the removal is a matter of immediate and urgent necessity.

■ Subdivision 2 of section 2—10, which governs temporary custody hearings, provides:

"(2) If the court finds that there is probable cause to believe that the minor is abused, neglected or dependent, the court shall state in writing the factual basis supporting its finding and the minor, his or her parent, guardian, custodian and other persons able to

give relevant testimony shall be examined before the court. The Department of Children and Family Services shall give testimony concerning indicated reports of abuse and neglect, of which they are aware of [*sic*] through the central registry, involving the minor's parent, guardian or custodian. After such testimony, the court may, consistent with the health, safety and best interests of the minor, enter an order that the minor be released upon the request of parent, guardian or custodian if the parent, guardian or custodian appears to take custody. Custodian shall include any agency of the State which has been given custody or wardship of the child. If it is consistent with the health, safety and best interests of the minor, the court may also prescribe shelter care and order that the minor be kept in a suitable place designated by the court or in a shelter care facility designated by the Department of Children and Family Services or a licensed child welfare agency \*\*\*. In placing the minor, the Department or other agency shall, to the extent compatible with the court's order, comply with Section 7 of the Children and Family Services Act. In determining the health, safety and best interests of the minor to prescribe shelter care, the court must find that it is a matter of immediate and urgent necessity for the safety and protection of the minor \*\*\* that the minor be placed in a shelter care facility \*\*\*, and must further find that reasonable efforts have been made or that, consistent with the health, safety and best interests of the minor, no efforts reasonably can be made to prevent or eliminate the necessity of removal of the minor from his or her home." 705 ILCS 405/2—10(2) (West 1998).

The requirement of "immediate and urgent necessity" first appears in the seventh sentence of section 2—10(2), in the context of placement in a "shelter care facility." According to the minor, that requirement does not apply to the earlier statement in the fifth sentence that "[i]f it is consistent with the health, safety and best interests of the minor, the court may also prescribe shelter care and order that the minor be kept in a suitable place designated by the court." 705 ILCS 405/2—10(2) (West 1998). The minor claims the "immediate and urgent necessity" requirement applies only when the court is prescribing "shelter care," which the minor contends is defined in section 2—7(2) (705 ILCS 405/2—7(2) (West 1998)) as a place designated for a child who is being taken from his biological parents. Hence, according to the minor, "shelter care" is not a place for a child who is being taken from a foster parent (and not his biological parents), and "shelter care" placement is separate from the court's authority to order a child "kept in a suitable place." Thus the minor argues that the applicable standard in the instant case is not "immediate and urgent necessity" but rather whether the foster placement

is "suitable," which turns on whether it is "consistent with the health, safety and best interests of the minor." 705 ILCS 405/2—10(2) (West 1998). Since the juvenile court in the instant case found that the removal of A.H. from Margie B.'s foster home was "consistent with the health, safety and best interest of the minor," the court was within its statutory authority in ordering that removal. We find that construction tortured and unwarranted.

"Statutes must be read as a whole; all relevant parts of the statute must be considered when courts attempt to divine the legislative intent underlying the statute." *People v. NL Industries*, 152 Ill. 2d 82, 98, 604 N.E.2d 349, 356 (1992). The "probable cause" requirement is stated in the first sentence of section 2—10(2), and we find nothing to indicate that it does not also apply to the fifth sentence. Further, the minor is arguing for a separate construction of the fifth and the seventh sentences. Yet considering them together, as we must, it is clear they are related. The fifth sentence states in pertinent part that "[i]f it is consistent with the health, safety and best interests of the minor, the court may also prescribe shelter care and order that the minor be kept in a suitable place designated by the court or in a shelter care facility designated by the Department of Children and Family Services or a licensed child welfare agency." 705 ILCS 405/2—10(2) (West 1998). The seventh sentence picks up the fifth sentence's "health, safety and best interests" requirement, stating that "[i]n *determining* the health, safety and best interests of the minor to prescribe shelter care, the court must find that it is a matter of immediate and urgent necessity for the safety and protection of the minor *** that the minor be placed in a shelter care facility." (Emphasis added.) 705 ILCS 405/2—10(2) (West 1998). Hence, the "immediate and urgent necessity" requirement applies to the fifth sentence as well as the seventh. Further, the fifth sentence does not, as the minor contends, make a distinction between "shelter care" and "suitable place." The sentence states that "the court may also prescribe shelter care *and* order that the minor be kept in a suitable place." (Emphasis added.) 705 ILCS 405/2—10(2) (West 1998). There is no disjunctive "or" between the two, and the clear implication is that the "suitable place" is the particular placement chosen by the court[2] once it has prescribed "shelter care." Moreover, there is nothing in section 2—7 to indicate

---

[2]We are aware that the court in *In re R.M.*, 288 Ill. App. 3d 811, 817, 681 N.E.2d 652, 656 (1997), states that, except for the situation described in section 1—5(2)(b) of the Juvenile Court Act (not applicable here), the statute does not allow the juvenile court to select specific placements once the court decides to place a child with DCFS. However, we need not address any

that the term "shelter care" should be given the narrow meaning attributed to it by the minor. Section 2—7 states simply that " '[s]helter care' means a physically unrestrictive facility designated by the Department of Children and Family Services or a licensed child welfare agency, or other suitable place designated by the court for a minor who requires care away from his or her home." 705 ILCS 405/2—7(2) (West 1998). There is no indication that "home" here means the home of the biological parents and not a foster home as well. Further, the minor notes that section 2—7 includes the same language, "suitable place designated by the court," as in section 2—10(2). However, that only serves to underscore the link between "shelter care" and the "suitable place." Section 2—7 states unequivocally that "shelter care" *includes* a "suitable place designated by the court for a minor who requires care away from his or her home." 705 ILCS 405/2—7(2) (West 1998).

The language of sections 2—7 and 2—10 shows that, contrary to the minor's contentions, "shelter care" is not limited to a place for a minor who is taken from his biological parents, and "shelter care" and "suitable place" are not separate and distinct types of placement. Therefore, we hold that the requirements of "probable cause" and "immediate and urgent necessity" apply to the fifth sentence of section 2—10(2) as well as the seventh. In the instant case, in order for the juvenile court's order to be valid, there must have been probable cause to believe A.H. was abused, neglected or dependent, and it must have been a matter of immediate and urgent necessity that he be removed from Margie B.'s foster home.

The case of *In re R.M.*, 288 Ill. App. 3d 811, 681 N.E.2d 652 (1997), on which DCFS relies, is on point. There the appellate court held that, absent a finding of urgent and immediate necessity, the juvenile court had no authority to conduct an emergency hearing to change placement and order the child removed from a foster home. *R.M.*, 288 Ill. App. 3d at 818, 681 N.E.2d at 657. In *R.M.*, DCFS had removed the minor from a foster home and placed her in a different home after she was diagnosed with nonorganic failure to thrive, or malnutrition. The initial foster parent filed a service appeal challenging the removal of R.M. from her home. Upon emergency review, a DCFS hearing officer issued an interim decision finding there was no risk of imminent harm to R.M., and she was returned to the initial foster home. DCFS then

---

potential contradiction because the court in the instant case only acted to remove the child from his preexisting placement but did not attempt to dictate his new placement. Accordingly, the issue of specific placement is not before us.

conducted an optional mediation as part of the service appeal process, but the placement issue was not resolved. Although the service appeal was still pending, the minor's court-appointed guardian *ad litem* (GAL) filed an emergency motion to change placement with the juvenile court. Following an evidentiary hearing, the juvenile court found that it was not in the child's best interest to remain in that home and ordered her removed from the foster home and placed in a specific alternate foster home. The appellate court vacated the juvenile court's order, noting that "[h]ad there been an immediate and urgent necessity to remove R.M. from [the foster home], the juvenile court could have removed R.M. from such a dangerous placement by holding a temporary/shelter care hearing pursuant to section 2—10 of the [Juvenile Court] Act." *R.M.*, 288 Ill. App. 3d at 818, 681 N.E.2d at 657. However, the court found no evidence of such necessity, adding that "the GAL could have completed the service appeal process without putting R.M. in any immediate danger." *R.M.*, 288 Ill. App. 3d at 819, 681 N.E.2d at 657. Thus the court held that the GAL's action in filing the emergency motion with the juvenile court "was simply an attempt to circumvent the [DCFS] service appeal process." *R.M.*, 288 Ill. App. 3d at 820, 681 N.E.2d at 658. See also *In re S.M.*, 223 Ill. App. 3d 543, 548, 585 N.E.2d 641, 645 (1992) (discussed more fully below).

DCFS argues that here, just as in *R.M.*, there was no urgent and immediate necessity to remove A.H. from the foster home. DCFS notes that the evidence showed A.H. received his injuries from Margie B.'s grandson, Norman, when they fought. In addition, at the time of the juvenile court hearing, a protective plan was in place ensuring that A.H. and Norman would not be allowed together unsupervised in the future. DCFS also notes that no further incidents occurred between the signing of the protective plan (January 6, 1999) and the January 19 juvenile court hearing. DCFS thus contends that, because there was no immediate and urgent necessity, the juvenile court acted outside its statutory authority when it ordered the removal of A.H. from Margie B.'s foster home. DCFS further argues that, just as in *R.M.*, the juvenile court hearing in the instant case was an attempt to sidestep the DCFS service appeal process. Because there was no emergency here, DCFS argues that the service appeal process could have been utilized without putting A.H. in any immediate danger.

The case of *In re Lawrence M.*, 172 Ill. 2d 523, 670 N.E.2d 710 (1996), upon which the minor relies, is inapposite. There our supreme court held that the juvenile court has statutory authority to order DCFS to provide and pay for in-patient drug treatment services for mothers whose children were removed from their custody because of the mothers' drug-related neglect of them. *Lawrence M.*, 172 Ill. 2d at

529, 537, 670 N.E.2d at 714, 717. In *Lawrence M.*, DCFS challenged the juvenile court's authority under section 2—10 to issue such orders. The supreme court found that authority in section 2—10. In reaching that conclusion, the court noted that, under section 2—10(2), the juvenile court has authority "to enter orders for the 'provision of services to the minor or his family to ameliorate the causes contributing to the finding of probable cause' [that there is abuse or neglect]." *Lawrence M.*, 172 Ill. 2d at 528, 670 N.E.2d at 713, quoting 705 ILCS 405/2—10(2) (West 1994). The court also found that other statutory provisions showed that "drug treatment for parents of neglected and abused children was among the services the legislature intended DCFS to provide." *Lawrence M.*, 172 Ill. 2d at 530, 670 N.E.2d at 714-15.

The minor argues that just as the *Lawrence M.* court found authority in section 2—10(2) for the juvenile court to order DCFS to provide in-patient drug treatment services, there is also authority in 2—10(2) for the court to order the removal of A.H. from Margie B.'s foster home. The minor thus argues that there is broad authority in section 2—10(2) for the juvenile court to enter orders as to both services and foster placement. We disagree. The court in *Lawrence M.* based its holding not only on section 2—10(2) but on "other statutory provisions" which "make it clear that drug treatment for parents of neglected and abused children was among the services the legislature intended DCFS to provide." *Lawrence M.*, 172 Ill. 2d at 530, 670 N.E.2d at 714-15. There is nothing in the *Lawrence M.* majority opinion to indicate its holding covers not only drug treatment services but foster placement as well. We decline to extend the decision beyond its limited scope.

The minor also notes that *R.M.* is a postdispositional case, and he argues that the "probable cause" and "immediate and urgent necessity" limits on section 2—10 authority delineated in *R.M.* do not apply in a *pre*dispositional setting. A predispositional proceeding is one that takes place prior to the dispositional hearing, which is a "hearing to determine whether a minor should be adjudged to be a ward of the court, and to determine what order of disposition should be made in respect to a minor adjudged to be a ward of the court." 705 ILCS 405/1—3(6) (West 1998). In *R.M.*, the placement order at issue came after the minor had been adjudged a ward of the court, while in the instant case, the petition for adjudication of wardship was still pending at the time of the January 19-20 juvenile court proceeding. However, the decision in *In re S.M.*, 223 Ill. App. 3d 543, 548, 585 N.E.2d 641, 645 (1992), specifically negates the thrust of the minor's contention in this regard. There, the court explicitly held that the prohibition under section 2—10 restricting any placement intervention by the juvenile

court in the absence of immediate and urgent necessity explicitly applies to pre-dispositional hearings. There the court stated:

> "A finding that 'it is a matter of immediate and urgent necessity for the protection of the minor' that the trial court place him in a shelter-care facility is only required at shelter-care hearings conducted under section 2—10 of the Act (Ill. Rev. Stat. 1989, ch. 37, par. 802—10 [(an earlier version of 705 ILCS 405/2—10 (West 1998))]), *i.e.*, those occurring prior to any formal finding or adjudication of abuse or wardship." *S.M.*, 223 Ill. App. 3d at 548, 585 N.E.2d at 645.

If anything, the foregoing language in *S.M.* casts some doubt as to its application to postdispositional proceedings, which we are not here required to ascertain.

The minor argues that in a postdispositional proceeding, such as a permanency hearing, the juvenile court has limited authority with respect to foster placement because it has extensive countervailing general power with respect to approval and disapproval of placement. Section 2—28 of the Juvenile Court Act authorizes the court to conduct a permanency hearing, which is a hearing to set the permanency goal, review the service plan, and determine whether the plan and goal have been achieved. 705 ILCS 405/1—3(11.2), 2—28(2) (West 1998). A permanency goal is a goal such as (1) adoption or (2) returning the child to the home, as defined in section 2—28(2). 705 ILCS 405/1—3(11.1) (West 1998). A service plan is a plan developed jointly by a family and DCFS based on its assessment of the family's need for services, where there is evidence a child is abused or neglected. 325 ILCS 5/8.2 (West Supp. 1997). If the court conducting the permanency hearing finds that the permanency goal cannot be achieved immediately, it makes a number of determinations, including (1) "[w]hether the services required by the court and by any service plan *** have been provided and *** if so, whether the services were reasonably calculated to facilitate the achievement of the permanency goal," and (2) "[w]hether the minor's placement is necessary, and appropriate to the [service] plan and [permanency] goal." 705 ILCS 405/2—28(3)(b)(ii), (3)(b)(iii) (West 1998). Though section 2—28 grants such authority as to services and placements, it also states that: "[u]nless otherwise specifically authorized by law, the court is not empowered under this subsection (2) or under subsection (3) to order specific placements, specific services, or specific service providers to be included in the [service] plan." 705 ILCS 405/2—28(2) (West 1998). The minor thus argues that while the court in a postdispositional permanency hearing cannot order *specific* placements or services, "it nevertheless has the authority to approve or disapprove a child's current placement and services."

The minor apparently contends that, in a *pre*dispositional case, where there is no such explicit statutory authority to approve or disapprove current placement and services, there is also no such prohibition against ordering specific placements and services or the removal from any such existing placement. We disagree. There is nothing in section 2—10 to distinguish between pre and postdispositional hearings so as to render its provisions applicable to the one and not the other. The restriction imposed by its provisions, which precondition the removal from foster placement upon a finding of immediate and urgent necessity, would therefore apply in either case.

■ Accordingly, we fail to see why the restrictions in section 2—10 requiring a finding of immediate and urgent necessity should apply *after* a dispositional hearing but not before. There is no indication of any such distinction in either section 2—10 or in *Lawrence M.*, for that matter. We therefore find that the attempted differentiation between predispositional and postdispositional is a distinction without a difference, at least with respect to the application of section 2—10.

Having concluded that section 2—10 limits the power of the juvenile court to involve itself in foster placement decisions, allowing such involvement only in the case of an emergency, we further agree with DCFS that the evidence here does not support a finding of immediate and urgent necessity. In juvenile court proceedings, a court's determinations of abuse and neglect are upheld unless they are against the manifest weight of the evidence. See *In re M.Z.*, 294 Ill. App. 3d 581, 592, 691 N.E.2d 35, 43 (1998) (trial court's determination that child was neglected by parent "will not be overturned unless the findings of fact are against the manifest weight of the evidence"). A decision is against the manifest weight of the evidence if the record shows that "the proper result is the one opposite that reached by the trial court." *M.Z.*, 294 Ill. App. 3d at 592, 691 N.E.2d at 43. We believe that is the case here.

The record shows that A.H. sustained his injuries while fighting with Norman and that there was little chance of such fights recurring. As of January 20, 1999, the second day of the juvenile court hearing, there were two separate protective plans in place ensuring that the two boys would not be allowed together unsupervised. In addition, both Edwards, the Central Baptist caseworker, and Boits, the DCP investigator, testified that A.H. was not at risk of physical harm in the foster home. Edwards testified that Margie B.'s home was a "proper placement" for A.H. and that she felt he was safe there. Boits, whom the juvenile court termed "one of the most credible witnesses that I have ever seen," emphasized that A.H. never indicated it was an adult who physically abused or neglected him. Boits said he did not feel A.H.

was at risk of physical harm and that there was no reason for him to be removed from Margie B.'s home.

We therefore find that the juvenile court exceeded its authority under the Juvenile Court Act in ordering A.H. removed from Margie B.'s foster home.

■ DCFS also argues that the juvenile court here violated several provisions of the Juvenile Court Act pertaining to temporary custody hearings and that its order therefore was invalid on that basis. According to DCFS, the juvenile court (1) failed to give Margie B. proper notice of the proceeding against her, (2) failed to require the filing of a petition prior to the temporary custody hearing, (3) violated the foster parent's right to counsel, (4) failed to submit written factual findings following the hearing, and (5) failed to schedule an adjudicatory hearing within 90 days of the temporary custody hearing. While our decision has already been determined on the grounds set forth above, we will briefly comment as to each of these contentions.

"[D]ue process of law requires that notice in juvenile proceedings be equivalent to that constitutionally required in criminal or civil cases." *In re C.R.H.*, 163 Ill. 2d 263, 269, 644 N.E.2d 1153, 1156 (1994); 705 ILCS 405/2—10(3) (West Supp. 1997). However, that issue is waived because the foster mother's counsel did not object during the juvenile court hearing. *In re R.M.*, 283 Ill. App. 3d 469, 472, 670 N.E.2d 827, 829 (1996). Though the DCFS counsel was present, she was not representing Margie B. and so lacked standing to object on her behalf as to that issue. The third issue, the alleged violation of the foster mother's right to counsel, also is waived for the same reasons. Further, it is not clear that the foster mother, who was granted intervener status, had the right to court-appointed counsel here. Under section 1—5 of the Juvenile Court Act, the court is to appoint counsel "[a]t the request of any party financially unable to employ counsel, *with the exception of a foster parent permitted to intervene under this Section.*" (Emphasis added.) 705 ILCS 405/1—5(1) (West 1998).

DCFS had standing to object and did object to the failure to require the filing of a petition. Section 2—13 of the Juvenile Court Act allows any person to file such a petition and states what the petition shall include. 705 ILCS 405/2—13 (West 1998). Further, DCFS asserts it is contemplated that changes of custody brought under the Juvenile Court Act are done so pursuant to a written petition. See *In re J.S.*, 272 Ill. App. 3d 219, 223, 652 N.E.2d 30, 33 (1995) (section 2—28 of Juvenile Court Act contemplates filing of written petition for change of custody). Nevertheless, it is not clear that failure to require the filing of a petition, standing alone, is sufficient to render the juvenile court's order invalid. See *People ex rel. Davis v. Vazquez*, 92 Ill. 2d 132,

151, 441 N.E.2d 54, 62 (1982) (noting that "it is not necessary that a petition be filed before the juvenile court can act to secure necessary care, treatment and services for a minor held in custody" under section 3—6(2) (Ill. Rev. Stat. 1979, ch. 37, par. 703—6(2)) (an earlier version of section 2—10(2))).

As to the juvenile court's alleged failure to submit written factual findings, the court did submit factual findings, but for the reasons already discussed, we find them to be insufficient as a matter of law. Finally, as to the juvenile court's alleged failure to schedule a timely adjudicatory hearing, section 2—14 of the Juvenile Court Act provides:

"When a petition is filed alleging that the minor is abused, neglected or dependent, an adjudicatory hearing shall be commenced within 90 days of the date of service of process upon the minor, parents, any guardian and any legal custodian ***." 705 ILCS 405/ 2—14(b) (West 1998).

Under section 2—14(c), "[i]f the adjudicatory hearing is not heard within the time limits required by subsection (b) *** upon motion by any party the petition shall be dismissed without prejudice." 705 ILCS 405/2—14(c) (West 1998). Subdivision (d) adds that "[t]he time limits of this Section may be waived only by consent of all parties and approval by the court." 705 ILCS 405/2—14(d) (West 1998). Hence, if in the instant case the adjudicatory hearing were not commenced in a timely fashion and there was no waiver of the time limit, DCFS may well be correct in its contention that it would impact the validity of the court's order here. However, there is nothing in the record to indicate whether an adjudicatory hearing was scheduled or held, and we are unwilling to consider as dispositive something that does not appear in the record. This is particularly true where, as noted above, we have already decided the case on substantive grounds and are not compelled to rule on DCFS's procedural contentions.

We also decline to reach the constitutional issue of whether the juvenile court's order violated the separation of powers doctrine. Because we have already determined the issue substantively, we ought not consider any constitutional arguments. *Howard v. Lawton*, 22 Ill. 2d 331, 334, 175 N.E.2d 556, 558 (1961) (court passes on constitutional issues only where cause cannot be decided on other grounds).

For the reasons set forth above, we reverse the juvenile court's order that DCFS remove A.H. from Margie B.'s foster home.

Reversed.

COUSINS, P.J., and McBRIDE, J., concur.