*In re* BABY BOY BUTT *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* KATHLEEN BUTT, Respondent-Appellant.)

Second District   Nos. 77-395, 77-418 cons.

Opinion filed February 13, 1979.

Frank Wesolowski, Jr., Public Defender, of Wheaton (Robert H. Heise, Assistant Public Defender, of counsel), for appellant.

F. Michael Fitzsimmons, State's Attorney, of Wheaton (John T. Elsner, III, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

Kathleen Butt, mother of Constance Butt and William Butt, appeals

from the dispositional order of the trial court adjudging Constance and William to be neglected minors within the meaning of section 2—4(1)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 702—4(1)(a)), and placing them under the guardianship of the administrator of the Department of Children and Family Services (hereinafter referred to as "DCFS").

Kathleen Butt married William Butt in February of 1975. He had previously been married and his wife had died, leaving a child of the marriage about 2½ years old, named Amy. Kathleen also had a child—Constance—about three years old at the time of Kathleen's marriage to William, who was the offspring of a man who had promised to marry Kathleen and then had not done so.

Kathleen had steady employment as a beautician and also worked part time at a lunch counter preparing sandwiches. William's employment appeared to have been sporadic and he had a tendency to drink too much. William's mother lived with them in the apartment they occupied and was supposed to look after the two little girls, cook the meals, etc. Testimony at trial indicated she did very little around the house, leaving most of the cooking and housework, as well as the care of the children, to be done by Kathleen when she returned from work. Domestic quarrels ensued not only from the mother-in-law's failure to function as had been anticipated by Kathleen but also because of differences in the treatment and attitudes toward the children. Kathleen testified she got along fine with her own daughter, Constance, but was always having trouble with Amy, her step-daughter. She felt her husband and her mother-in-law favored Amy and spoiled her, making it difficult for Kathleen to manage her. She testified that because of differences with her husband over their attitudes toward the two children she often took Constance to work with her, rather than leave her at home with her husband and mother-in-law. In September 1975, following a quarrel with William, she wrote a letter to a friend asking the friend to take care of Connie if anything should happen to her, Kathleen.

Six or eight months after William and Kathleen were married, Amy's arm was injured and apparently a neighbor reported to the DCFS that the child was being abused. A visit by a worker from DCFS resulted in no action since William and Kathleen denied any abuse of Amy and explained that she had injured her arm in an accidental fall. Tension continued to mount in the Butt household, especially after Kathleen became pregnant with the child William. At this time Kathleen was quarreling with her husband, who was often intoxicated. She was resentful of her mother-in-law's drinking habits and her failure to tend to the cooking and care of the children, and she was feeling the effects of her pregnancy. She was also experiencing increasing difficulty in dealing with

Amy's tantrums. On the night of February 3, 1976, according to her statement made to the police, Kathleen fed the children and sent them to bed. Amy did not want to go to bed and according to Kathleen's statement threw another tantrum while she was in the bathroom. Kathleen's statement as to what happened next is somewhat vague. She remembers spanking Amy and that the child fell to the floor and started "heaving." She also remembers that Amy vomited considerably and then went into a coma. Kathleen called her husband who was working nights at a gas station and they rushed Amy to the hospital, where she shortly afterward expired. An examination of Amy in the hospital disclosed a black eye and numerous bruises on her body, both front and back. Shortly after Amy's death, Kathleen was delivered of the infant William. At that time she was under arrest and the authorities were investigating the circumstances of Amy's death. Kathleen was subsequently charged with involuntary manslaughter to which she pleaded guilty and was sentenced to not less than three nor more than nine years in the penitentiary.

Immediately following Kathleen's arrest and incarceration, the State petitioned to have the minors Constance and William adjudged neglected minors and made wards of the court. The order of the circuit court finding the minors to be neglected minors and the dispositional order awarding custody to the administrator of the Department of Children and Family Services, as guardian, are the bases of this appeal by Kathleen Butt in which she raises the following contentions: (1) that the finding of the trial court that the respondent minors were neglected minors was against the manifest weight of the evidence; (2) that the trial court erred in denying the respondent mother's motion *in limine* to bar certain testimony regarding the details of the death of Amy Butt; (3) that the court erred in denying the respondent parent's motion for separate trials, and (4) the trial court erred in allowing the State to call the respondent mother as a witness under section 60 of the Civil Practice Act.

■■ We are of the opinion the last three contentions do not require extended comment. The respondent contends that the underlying circumstances of Kathleen's conviction for involuntary manslaughter are not relevant to the issues to be determined at the adjudicatory hearing, that is, (a) whether the parents can or will provide adequately for the support, education and medical or remedial care of the children and (b) whether either child is without a parent. (It should be noted that the State's petition was brought only under section 2—4(1)(a) of the Juvenile Court Act, not under section 2—4(1)(b) of said Act, dealing generally with injurious environment.) The State moved to amend the petition just before the trial started, but the motion was denied. We think, however, that the trial court, under the circumstances of this case, ruled correctly

that while the issue of Kathleen's guilt or innocence in the criminal case is not relevant, the parents' conduct toward the children in their care was material in determining the issue of neglect and, therefore, of custody, and to the extent the details sought to be elicited at the hearing were relevant to the issue of neglect, they could be shown.

■■■ Likewise, as to the objection to the denial of the motion for separate trials, we think in a proceeding to determine whether the children are neglected minors, the family must be regarded as a unit and the interaction of the parents on each other and on the children is not logically separable as between husband and wife, where they are living together and both are involved in the support, care and discipline of the children. There were elements in the home environment which showed the father in a bad light and other elements which mitigated against the mother. The father's conduct was bad from a negative standpoint—irresponsibility, laziness and too much drinking. The respondent mother's behavior was bad from a more positive standpoint. She earned the living for the family, cooked the meals and took care of the children, but at least, as far as Amy was concerned, she had a tendency to lose her temper and physically punish, if not abuse, the child. Thus, it was all part of the entire environmental picture. There may be cases where the facts point to a conflict of interest, requiring separate trials, but this case does not present such a conflict, merely because only one parent participated in the immediate conduct which is alleged to have caused the death of Amy and precipitated the petition to adjudge Kathleen's children wards of the State. In any event, only the husband could conceivably be damaged by a joint trial and he is not a party to this appeal, so that the respondent lacks standing to claim prejudice by a joint trial.

■■■ Nor do we find any substance to the contention that the respondent mother cannot be called under section 60, either in the words of that statute or by virtue of section 5 of "An Act in regard to evidence and depositions" (Ill. Rev. Stat. 1975, ch. 51, par. 5). While the intention of this section of the Act is salutary, it is intended to preserve the privacy of personal communications between spouses and is not a blanket rule designed to prevent one spouse from testifying where the other spouse is a party to an action. The rule thus should be invoked only at the time a specific occasion arises through a question or answer which invades the marital relationship intended to be protected by this section. In any event, there is a specific exception to the general prohibition against husband and wife testifying against each other, that is "* * * except in * * * actions where the custody or support of their children is directly in issue * * *." We conclude, therefore, that this contention of the respondent is not well taken.

We come now to the fundamental question raised by the respondent's

first contention, that the finding of the trial court that the respondent's children were neglected minors, within the meaning of section 2—4(1)(a) of the Juvenile Court Act, which is a jurisdictional finding, is against the manifest weight of the evidence. This question is made very difficult by the inconsistency of the respondent's behavior between her own child, Constance, and her step-child, Amy. Whereas Kathleen admitted having continual difficulties with Amy and physically punishing her on several occasions, there was no hint of any untoward conduct in her relationship with her own child, Constance. That she was loving and protective toward Constance seems clear from the testimony of all the witnesses—in fact, there was no hint anywhere of cruelty, neglect or indifference by Kathleen where Constance was concerned, and the testimony of others was consistent with a warm and loving relationship existing between Kathleen and Constance. Neither morally or physically was Constance neglected and the only instance of cruelty to Constance in the testimony was that of a witness who said that Constance had told her that William—her step-father—had burned her fingers on the stove because she was picking at her face. Bearing in mind the literal language of the statute—section 2—4(1)(a) of the Juvenile Court Act—and applying this language to the respondent mother and her two minor children, the parties before the court under the petition—it is clear that the conditions for the exercise of wardship by the State were not met.

■■ On the other hand, however, there is clearly a potential danger to the minors if the violence exhibited toward Amy should be transferred to them. William, the step-father of Constance—and the actual father of William, Jr.—has not appealed the finding of the circuit court and the appointment of the Department of Children and Family Services as guardian, so we need not consider the trial court's finding other than with relation to Kathleen's position. The trial court, in its remarks accompanying its finding that the children were neglected minors under section 2—4(1)(a), said:

> "The Court also finds from all of the evidence that both Kathy Butt, Constance's natural mother, and William Butt, her stepfather, and, of course, the two parties being the natural parents of William R. Butt, are guilty of child abuse and that said conduct poses a basic threat to the safety and health and welfare of both of these children."

It is clear that the court's finding was not based on the abstract question of whether or not the minors were actually neglected as to proper or necessary support or education or as to medical or other remedial care, or other care necessary for the children's well-being, or were abandoned, as the language sets forth for a jurisdictional finding under section 2—4(1)(a). Rather, it is based on the court's finding that the

parents had been guilty of "child abuse"—that is, that the environment of the children was "injurious to their welfare"—which is a finding under section 2—4(1)(b) of the Act. It should be remembered, however, that this section was not contained in the State's original petition and when offered as an amendment at the last moment, before trial, the court sustained the respondent's objection to adding it to the petition. Technically, therefore, it is not part of the State's petition. Moreover, the manifest weight of the evidence clearly does not support a finding of an injurious environment as to either Constance or William and the trial court's finding must, therefore, depend for its jurisdictional validity on the future possibility of cruelty or abuse deduced from the treatment of the deceased child, Amy, by Kathleen.

Is this sufficient for a finding under section 2—4(1)(a) of the Juvenile Court Act?

Somewhat the same problem was considered by the court in the recent case of *In re Brooks* (1978), 63 Ill. App. 3d 328. In that case, there were three children in the family—Errol and Michelle, children of Joan Bariffe by a previous marriage, and Yvette, the child of Joan and Fitz Bariffe. During a period of several months, the minors Errol and Michelle were observed by school authorities to exhibit evidence of child abuse. Errol complained of being beaten by his mother. Some weeks afterward, the police were called to the Bariffe home where they found Michelle lying lifeless on a cot. An autopsy showed numerous scars and bruises on her body as well as the cranial injury which had apparently caused her death. The State then brought separate petitions as to each surviving child to make them wards of the State. At the dispositional hearing the parents contended that since there was no evidence of any abuse or neglect of Yvette, the child of both parents, the finding was in error as to her, even if the petition was sustained as to the boy, Errol. The State contended the evident abuse of Errol and Michelle established an environment injurious to the welfare of Yvette—the infant. The parents cited the case of *In re Nyce* (1971), 131 Ill. App. 2d 481, as sustaining their contention that future possibilities of neglect or injury cannot sustain a finding of present neglect. In that case, the mother was thought to be immature and irresponsible, however, she had never actually had custody of the child— which she had left in the hospital's care after it was born. The court in rejecting the State's petition for a finding that the child was a neglected minor, said:

> "* * * The scope of authority of the Circuit Court to deal with minors under section 702—4 is limited to minors who are actually neglected and does not extend to those who are thought to be subject to neglect in the future." 131 Ill. App. 2d 481, 487.

However, in the *Brooks'* case the court refused to follow the

reasoning of the *Nyce* case and said that while it agreed that a court might not speculate as to the future care of a child, the primary consideration in any child neglect case was the welfare of the child and "[w]hen faced with evidence of prior abuse by parents, the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury," and therefore, "[i]t was not unreasonable for the trial court to conclude that Yvette was subject to an environment of physical abuse and that it was in Yvette's best interests to adjudicate her a ward of the court." 63 Ill. App. 3d 328, 339.

The case before us has aspects similar to *Brooks* but falls somewhat short of its facts in two important respects. In the *Brooks'* case there were two abused children—one of whom personally accused the mother of abuse and both of the abused children were the natural children of the abusive mother, but not of her husband, so that she had complete responsibility for and control over them. In the case before us, the only abused child was the respondent's step-daughter and the problems between them were claimed by the respondent to be due to the interference of the paternal grandmother and the natural father, who allegedly favored Amy over the respondent's own child. The frustrations invoked by this situation were referred to by the psychiatrist, Dr. Rossiter, in his testimony pointing out not only the divided authority over Amy but the differences in attitude caused by the lack of intimate association between Kathleen and Amy during the formative period of weaning and toilet training which Kathleen had experienced with her own child and which had created a rapport between mother and daughter. This, in the absence of this early association and the presence of the paternal grandmother, had never been achieved with Amy. While it is true that the lessening of the maternal instinct toward Amy, while rationally explainable, does not excuse her abusing the child, it may also be true that there is no reason to suppose from her history with Amy that the same was likely to occur with her natural daugher, Constance, or the infant, William. The psychological situation, as pointed out by Dr. Rossiter, is too different to allow any conclusion, except the tentative one that Kathleen's relationship with and attitude toward Amy were perhaps psychological and peculiar to that child and not apt to be repeated with her natural children, since she had not exhibited anything other than a loving and protective attitude toward her daughter, Constance. We are dealing here with the future and only possibilities and probabilities can be assessed. To expose respondent's children to a reasonable probability of abuse is something this court will not do. On the other hand, no child in any family is free from the *possibility* of future abuse and we cannot afford to sever the natural ties between parent and child and cause that loss to both of them on the mere possibility that the child may be abused.

In this case we do not see that a recurrence of what occurred with Amy is at all probable as between Kathleen and Constance. We think the evidence does not point to it and Kathleen has already been severely punished for her conduct toward Amy.

As to the infant William, Kathleen, of course, never had custody of him and hence no objective standard can be established as to the relationship between Kathleen and this child.

■■ It is a difficult decision, but we are of the opinion the evidence at the trial did not establish the jurisdictional facts necessary to award the guardianship of the respondent's children to the administrator of the DCFA under section 2—4(1)(a) of the Juvenile Court Act. The decision of the trial court is accordingly reversed. It should be noted that considerable time has elapsed since Kathleen's incarceration. What has transpired in the meantime may be pertinent to any further actions, if any are or may become necessary in this cause.

Reversed.

SEIDENFELD and WOODWARD, JJ., concur.