728 N.E.2d 1165 (2000)
313 Ill. App.3d 121
245 Ill.Dec. 808
In re S.S., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
R.S. and K.T., Respondents-Appellants).
Nos. 2-99-0058, 2-99-0176.
Appellate Court of Illinois, Second District.
May 1, 2000.
*1167 Josette Skelnik (Court-appointed), Law Offices of Josette Skelnik, Elgin, for R.S., Mother in No. 2-99-0058.
David R. Akemann, Kane County State's Attorney, St. Charles, Martin P. Moltz, Deputy Director, State's Attorneys Appellate Prosecutor, Elgin, Kristine A. Karlin, Mt. Prospect, for the People in Nos. 2-99-0058, 2-99-0176.
Walter J. Donat, Guardian Ad Litem, Donat & Donat, PC, Batavia, for S.S. in Nos. 2-99-0058, 2-99-0176.
David P. Kliment, Kane County Public Defender's Office, Sandra L. Byrd, Assistant Public Defender (Court-appointed), St. Charles, for K.T. in No. 2-99-0176.
Justice RAPP delivered the opinion of the court:
Respondents, R.S. and K.T., appeal separately from the trial court's order finding their son, S.S., a neglected minor and making him a ward of the court. Because the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 et seq. (West 1998)) seems to treat both parents as a unit (see In re M.K., 271 Ill.App.3d 820, 829, 208 Ill.Dec. 242, 649 N.E.2d 74 (1995)), we have consolidated respondents' appeals.
*1168 The record reveals the following facts relevant to our disposition. R.S. and K.T. have never been married to each other, and they are the parents of two children. Their daughter, A.T., was born November 27, 1995, and died January 6, 1996. Their son, S.S., was born November 7, 1997.
On December 22, 1995, A.T. was taken to the hospital by K.T. and K.T.'s mother. According to K.T., A.T. had rolled off the bed. A.T. was examined and discharged to the custody of her parents. Following A.T.'s injury, R.S. told a Department of Children and Family Services (DCFS) worker that K.T. took care of A.T. during the day while R.S. was at work but that K.T. often slept during the day because he worked nights. The DCFS worker testified that she suggested R.S. make alternate daycare plans for A.T. The DCFS worker admitted she never told R.S. that she could retain custody of A.T. only if she did not use K.T. as a babysitter, and there was never a court order directing R.S. not to leave A.T. in K.T.'s care. The DCFS worker also never told R.S. that K.T. was a threat to A.T.'s safety.
According to K.T., on January 4, 1996, he was babysitting A.T. He had fed her and laid her down in her crib. When he checked on her about 10 or 15 minutes later, he discovered that she was not breathing. He shook her foot in an attempt to elicit a response. When she did not respond, he rocked her in his lap and bounced her on his knee, but she remained unresponsive. K.T. stated that, at this point, he shook A.T., thinking this would resuscitate her. K.T. then called 911 and continued resuscitative efforts at the direction of the 911 operator. A.T. died at Rockford Memorial Hospital on January 6, 1996. The doctors diagnosed A.T. as having suffered from shaken impact/shaken baby syndrome. An autopsy confirmed that the cause of A.T.'s death was shaken baby syndrome. Following a jury trial, K.T. was acquitted of both first-degree murder and involuntary manslaughter with respect to A.T.'s death.
Almost two years after A.T.'s death, but prior to K.T.'s criminal trial, S.S. was born. S.S. was taken from R.S.'s custody at birth and placed by DCFS with R.S.'s sister. R.S. has visited S.S. daily and played with, fed, bathed, changed, and provided other care-taking duties for him.
K.T. has had weekly supervised visits with S.S. since S.S. was about four months old. K.T. has never missed a visit with S.S. According to a Catholic Charities caseworker, during the visits K.T. showed concern for S.S. and cared for him properly. K.T. was always eager to see S.S., and S.S. seemed attached to K.T. Based on the caseworker's observations, she believed K.T. was a good parent.
The record further indicates that both R.S. and K.T. have successfully completed parenting classes. R.S. apparently went to a social service agency requesting information about parenting classes even before DCFS referred her to the agency. According to the social service agency, K.T. seemed very comfortable with S.S. and was very gentle and patient with S.S., while R.S. was a very loving mother to S.S. and was very enthusiastic and concerned about S.S.
Evidence was presented concerning domestic violence between K.T. and R.S. Specifically, testimony was heard concerning an incident that occurred approximately eight months after S.S.'s birth. Apparently K.T. and R.S. were arguing over the possession of an automobile when K.T. pulled R.S. out of the car. R.S. reported the incident to the police. Additionally, R.S. told a social worker that K.T. had hit her in the past. The social worker had no specific knowledge of when or how R.S. was hit by K.T. or whether she was injured. K.T. and R.S. attended couples' counseling at the direction of DCFS.
The record further indicates that K.T. and R.S. do not currently reside together. At the time of the adjudicatory hearing, both reported that they were no longer *1169 dating and that R.S. was dating another man.
Following the adjudicatory hearing, the trial court entered an order finding that the State proved neglect of S.S. by a preponderance of the evidence by showing (1) that S.S.'s older sibling, A.T., died as a result of shaken impact/shaken baby syndrome; (2) that R.S. created a risk of harm to S.S. because she disregarded a DCFS protection plan by allowing S.S.'s older sibling, A.T., to be unsupervised in the presence of K.T.; and (3) that there is a history of domestic violence between R.S. and K.T., creating a risk of harm to S.S. The trial court further made a special finding that the State had shown by a preponderance of the evidence that K.T. caused the death of A.T.
A dispositional hearing was held on January 13, 1999. The trial court made S.S. a ward of the court and awarded guardianship to DCFS. Respondents timely filed separate appeals.

I. STANDARD AND SCOPE OF REVIEW
"Cases involving an adjudication of neglect and wardship are sui generis, and each case must ultimately be decided on the basis of its own particular facts." In re Edricka C., 276 Ill.App.3d 18, 25, 212 Ill.Dec. 383, 657 N.E.2d 78 (1995). The Act provides that a neglected child is a minor "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being" (705 ILCS 405/2-3(1)(a) (West 1998)) or a minor "whose environment is injurious to his or her welfare" (705 ILCS 405/2-3(1)(b) (West 1998)). An abused child includes any minor whose parent "creates a substantial risk of physical injury to such minor by other than accidental means." 705 ILCS 405/2-3(2)(ii) (West 1998). Under the Act, "proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." (Emphasis added.) 705 ILCS 405/2-18(3) (West 1998).
Generally, "neglect" is considered to be the failure by a responsible adult to exercise the care that circumstances demand and encompasses both willful and unintentional disregard of parental duty. In re Ashley F., 265 Ill. App.3d 419, 424, 202 Ill.Dec. 722, 638 N.E.2d 368 (1994). "Injurious environment" is an amorphous concept that cannot be defined with particularity, and each case therefore should be reviewed considering the specific circumstances of that case. M.K., 271 Ill.App.3d at 826, 208 Ill.Dec. 242, 649 N.E.2d 74.
Proceedings for adjudication of wardship should not be undertaken lightly. See In re Harpman, 134 Ill.App.3d 393, 396-97, 89 Ill.Dec. 391, 480 N.E.2d 873 (1985). The best interest of the child is the paramount consideration whenever a petition for adjudication of wardship is brought under the Act. In re K.G., 288 Ill.App.3d 728, 734-35, 224 Ill.Dec. 534, 682 N.E.2d 95 (1997). At an adjudicatory hearing, the State must prove its allegations of neglect or abuse by a preponderance of the evidence. See In re M.Z., 294 Ill.App.3d 581, 592, 229 Ill.Dec. 99, 691 N.E.2d 35 (1998). "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." K.G., 288 Ill.App.3d at 735, 224 Ill.Dec. 534, 682 N.E.2d 95. We will not disturb the trial court's determination of neglect unless its findings of fact are contrary to the manifest weight of the evidence. See M.Z., 294 Ill.App.3d at 592, 229 Ill.Dec. 99, 691 N.E.2d 35. "A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one." K.G., 288 Ill. App.3d at 735, 224 Ill.Dec. 534, 682 N.E.2d 95. This is so because the trial court is in *1170 a much better position than the reviewing court to observe the witnesses, assess their credibility, and weigh the evidence. K.G., 288 Ill.App.3d at 735, 224 Ill.Dec. 534, 682 N.E.2d 95.
Although the Act seems to treat both parents as a unit, it does not address the situation where only one separated parent has abused or neglected the child. M.K., 271 Ill.App.3d at 829, 208 Ill.Dec. 242, 649 N.E.2d 74. However, the implication of section 2-27 of the Act (705 ILCS 405/2-27 (West 1998)), which deals with placement, legal custody and guardianship, is that both parents must be adjudged unfit or unable to care for the child before placement with DCFS is authorized. M.K., 271 Ill.App.3d at 828, 208 Ill.Dec. 242, 649 N.E.2d 74. We therefore find it necessary to determine the neglect allegations as to both parents.

II. NEGLECT ALLEGATIONS AS TO K.T.

A. Determination that K.T. Caused the Death of A.T.
The trial court made a special finding that the State had shown, by a preponderance of the evidence, that K.T. caused the death of S.S.'s older sibling, A.T. K.T. appeals this determination. His basic contention is that A.T. was not breathing when he found her because of the injury she sustained when she fell off the bed two weeks earlier. He admits shaking A.T. We have thoroughly reviewed the testimony and evidence presented, and we cannot conclude that the trial court's determination that K.T. caused the death of A.T. was against the manifest weight of the evidence.

B. Determination of Neglect Based on a Prior Neglect and Abuse Determination Concerning an Older Sibling
In making its determination that S.S. was neglected, the trial court focused primarily on the past neglect and abuse of S.S.'s older sibling, A.T. K.T. argues that the trial court erred in basing its decision on a theory of "anticipatory neglect."
Sibling abuse may be prima facie evidence of neglect based upon an injurious environment. Cf. Edricka C., 276 Ill.App.3d at 27-28, 212 Ill.Dec. 383, 657 N.E.2d 78. However, this presumption is not permanent; it weakens over time and can be rebutted by the introduction of other evidence. Edricka C., 276 Ill.App.3d at 28, 212 Ill.Dec. 383, 657 N.E.2d 78. Nevertheless, "[w]hen faced with evidence of prior abuse by parents, the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury." In re Brooks, 63 Ill.App.3d 328, 339, 20 Ill.Dec. 39, 379 N.E.2d 872 (1978).
There is no per se rule of anticipatory neglect in Illinois, and each case concerning the adjudication of minors must be reviewed according to its own facts. See Edricka C., 276 Ill.App.3d at 31, 212 Ill. Dec. 383, 657 N.E.2d 78. To determine whether a finding of anticipatory neglect is appropriate, the trial court should consider the current care and condition of the child in question and not merely the circumstances that existed at the time of the incident involving the child's sibling. Edricka C, 276 Ill.App.3d at 28, 212 Ill. Dec. 383, 657 N.E.2d 78.
Turning to the case at hand, S.S. has never been abused by K.T., and the past abuse of A.T. occurred almost two years before S.S. was born. These factors work in K.T.'s favor. However, there is one other very important factor. K.T. was the person who caused the fatal injury of A.T. We believe that the fact that K.T. was the person who fatally injured A.T. was properly considered by the trial court in ascertaining whether S.S.'s environment would be injurious if he were in the custody of K.T.
We determine that evidence of past sibling abuse by K.T., which resulted in the death of A.T., was sufficient to establish a finding of neglect concerning K.T. Based *1171 on the evidence presented, we believe it was reasonable for the trial court to conclude that a recurrence of what occurred with A.T. is probable between K.T. and S.S. We therefore determine that the trial court's finding of neglect, as it pertains to K.T., was not contrary to the manifest weight of the evidence. Because we conclude that evidence of past sibling abuse alone was sufficient to establish a finding of neglect, we need not examine the other factors upon which the trial court based its finding of neglect as it pertains to K.T.
We note, however, that K.T. has cooperated with DCFS and has successfully completed parenting classes since the time of A.T.'s death and that all reports indicate that his supervised visits with S.S. are going very well. We acknowledge his efforts and encourage him to continue to be a positive role model in his son's life.

III. NEGLECT ALLEGATIONS AS TO R.S.

A. Determination of Neglect Based on a Prior Neglect and Abuse Determination Concerning an Older Sibling
Again, in making its determination that S.S. was neglected, the trial court focused primarily on the past neglect and abuse of S.S.'s older sibling, A.T. R.S. also argues that the trial court erred in basing its decision on a theory of "anticipatory neglect."
Although evidence of sibling abuse may be prima facie evidence of neglect, we believe a prima facie case has not been established with respect to R.S. Here, S.S. has never been abused or neglected by R.S., and the past abuse of A.T. occurred almost two years before S.S. was born. There are other very important factors in the case of R.S. She did not abuse or neglect S.S.'s older sibling, A.T., nor was she present when the abuse occurred. Furthermore, at the time of A.T.'s abuse, K.T. was living in the home. The evidence presented at the adjudicatory hearing indicated that K.T. is no longer living in the home with R.S. She has also successfully completed parenting classes since the time of A.T.'s death.
We determine that evidence of past sibling abuse by K.T. was insufficient to establish a finding of neglect concerning R.S. We must therefore examine the other factors upon which the trial court based its finding of neglect as to R.S.

B. Determination of Neglect Based on Disregard of a DCFS Protection Plan Concerning an Older Sibling
The trial court also determined that S.S. was neglected based on R.S.'s disregard of a DCFS protection plan concerning S.S.'s older sibling, A.T. The evidence in this case simply does not support this finding. The record indicates that the DCFS worker merely "suggested" that R.S. obtain additional help to care for A.T. The DCFS worker admitted she never told R.S. that she could retain custody of A.T. only if she did not use K.T. as a babysitter, and there was never a court order directing R.S. not to leave A.T. in K.T.'s care. Additionally, the DCFS worker never told R.S. that K.T. was a danger to A.T.'s safety. We find it significant that no effort was made to remove A.T. from R.S.'s care. Obviously, DCFS did not believe that A.T. was at risk of harm, and we fail to see how R.S. could now be held accountable for A.T.'s death. There is nothing to suggest that R.S. could have foreseen what happened to A.T., let alone that she was warned by the doctors or DCFS. Furthermore, as indicated above, the circumstances concerning S.S. are substantially different from those of A.T.
We determine that there was insufficient evidence of the creation of a service plan or that R.S. disregarded such a service plan. We do not need to address whether a service plan developed prior to adjudication or a shelter care hearing is binding on a parent. There was also insufficient evidence to put a reasonable parent on notice that something was amiss. We will therefore *1172 examine the final factor upon which the trial court based its finding of neglect as to R.S.

C. Determination of Neglect Based on History of Domestic Violence
The trial court also determined that S.S. was neglected based on a history of domestic violence between his parents. The evidence presented by the State in support of this theory was an incident occurring approximately eight months after S.S.'s birth and approximately five months before the adjudicatory hearing. This incident apparently involved a dispute between R.S. and K.T. concerning the possession of an automobile, where K.T. pulled R.S. out of the car. There was also testimony presented that R.S. told a social worker that K.T. hit her in the past.
The State relies on In re A.D.R., 186 Ill.App.3d 386, 393-94, 134 Ill. Dec. 308, 542 N.E.2d 487 (1989), in arguing that evidence of domestic violence is sufficient to support a finding of neglect based on creating an environment injurious to the minor's welfare. We agree that it is reasonable for a trial court to conclude that continuing physical abuse by one parent of another will cause emotional damage to a child and thus constitutes neglect. See A.D.R., 186 Ill.App.3d at 393, 134 Ill. Dec. 308, 542 N.E.2d 487. We also agree that the trial court need not wait until the minor becomes the victim of physical abuse nor wait until the repeated beatings of his mother cause so much damage that he is permanently affected. See A.D.R., 186 Ill.App.3d at 393-94, 134 Ill.Dec. 308, 542 N.E.2d 487. But we do not think that this is such a case.
In A.D.R., there were 62 emergency room visits and numerous beatings over a seven-year period, as compared to one documented altercation here. Additionally, in A.D.R., the parents were still living together and much of the spousal abuse occurred in the presence of the minor, unlike our case under review. Here, the record shows only one documented incident of domestic violence since S.S.'s birth. S.S. was not present during the dispute and has never witnessed domestic violence between his parents. R.S. and K.T. attended couples' counseling following this incident, as required by DCFS. R.S. and K.T. are not married and do not live together, and there is no indication of their reuniting. Since the record contains no documented evidence of any domestic violence since that time, we assume that the domestic violence counseling was successful. We cannot conclude with regard to R.S. in this case that the evidence of domestic violence was sufficient to support a finding of neglect based on creating an environment injurious to S.S.'s welfare.

D. Whether S.S. Is Neglected Because of R.S.'s Refusal to Acknowledge Both Her Own and K.T.'s Roles in the Death of A.T.
At this point, we feel compelled to address the State's arguments that S.S. should not be returned to R.S.'s care because she refuses to acknowledge that K.T. caused A.T.'s death and because she refuses to acknowledge her own role in causing A.T.'s death. The State urges that R.S. is not protective of S.S. and concludes that "It was in S.S.'s best interests that he be removed from respondent's custody until such time, if ever, that she can satisfy the court that she is willing and able to protect him."
As noted above, we find it significant that DCFS never made any effort to remove A.T. from R.S.'s care. The record fails to contain sufficient factual evidence that requires a conclusion that anything R.S. did, or failed to do, in connection with A.T.'s death would create a substantial risk of harm to S.S. The State acknowledges that R.S. has been cooperative and has completed counseling as required by DCFS. Moreover, R.S. testified that she has never allowed visits between S.S. and K.T. and would never leave S.S. unattended. R.S. further stated that if S.S. were returned to her custody, she would not let *1173 K.T. visit him unless she was present. It is unclear what else R.S. must do to show that she is willing and able to care for S.S.
The State has attempted to shift the burden of proof to R.S. in this case. We must remind the State that it, not R.S., bears the burden at an adjudicatory hearing of proving its allegations of neglect or abuse by a preponderance of the evidence. See M.Z., 294 Ill.App.3d at 592, 229 Ill. Dec. 99, 691 N.E.2d 35. We note that these allegations were not contained in the State's petition for adjudication of wardship, nor do these facts constitute prima facie evidence of abuse or neglect under section 2-18(2) of the Act. See 705 ILCS 405/2-18(2) (West 1998).
It appears that the State simply wishes R.S. to admit that she is to blame for A.T.'s death. This admission could then be used against her to show unfitness in an attempt to terminate her parental rights. See 750 ILCS 50/1(D)(f) (West 1998) (grounds of unfitness include a finding of physical child abuse resulting from the death of any child). We will not require R.S. to make such an admission, especially where she did not inflict the injury upon A.T. and was not present when the single suspect injury was inflicted.
Based on the facts of this case as they pertain to the relationship between R.S. and her son, S.S., we agree with R.S. that the trial court based its findings concerning R.S. on too much speculation. There was insufficient evidence to establish that R.S. neglected S.S., as that term is used in the Act. The trial court merely speculated as to the future care of S.S.
As this court noted in In re Baby Boy Butt, 76 Ill.App.3d 587, 32 Ill.Dec. 54, 395 N.E.2d 1 (1979):
"We are dealing here with the future and only possibilities and probabilities can be assessed. To expose respondent's children to a reasonable probability of abuse is something this court will not do. On the other hand, no child in any family is free from the possibility of future abuse and we cannot afford to sever the natural ties between parent and child and cause that loss to both of them on the mere possibility that the child may be abused." (Emphasis in original.) Butt, 76 Ill.App.3d at 594, 32 Ill.Dec. 54, 395 N.E.2d 1.
We conclude that the record in this case does not support the trial court's determination that S.S. was neglected by R.S. We therefore hold that this determination by the trial court was against the manifest weight of the evidence.

IV. DISPOSITION
Because the evidence of past sibling abuse by K.T. was sufficient to establish a finding of neglect, the trial court properly determined that it was in the best interest of S.S. that he be made a ward of the court. See 705 ILCS 405/2-22 (West 1998). Section 2-23 of the Act authorizes the trial court to enter dispositional orders for the custody or placement of neglected minors. 705 ILCS 405/2-23 (West 1998). Section 2-27 of the Act provides:
"Placement; legal custody or guardianship.
(1) If the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian, the court may * * *
* * *
(d) commit the minor to the Department of Children and Family Services for care and service * * *." 705 ILCS 405/2-27 (West 1998).
*1174 This section of the Act requires both parents to be adjudged unfit or unable to care for the child before placement with DCFS is authorized. See M.K., 271 Ill.App.3d at 828, 208 Ill.Dec. 242, 649 N.E.2d 74. "[N]atural parents of a child have a superior right as against the world to custody of their child, unless the natural parents are found to be unfit." In Interest of Ozment, 61 Ill.App.3d 1044, 1048-49, 18 Ill.Dec. 945, 378 N.E.2d 409 (1978). A fit parent has a superior right to custody of his or her child, which can only be superseded by a showing of good cause to place custody of the child in a third party. M.K., 271 Ill.App.3d at 830, 208 Ill.Dec. 242, 649 N.E.2d 74.
This is a difficult case, but we are of the opinion that the State cannot establish good cause to place a minor outside the custody of an otherwise fit parent under section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 1998)). We believe our conclusion to be consistent with the letter and spirit of the Juvenile Court Act. Placing a child under the guardianship of DCFS is a serious matter. If that child is able to be well cared for by a fit and able parent, if the child's environment is not injurious, if the child is neither physically nor psychologically abused or neglected, and if there is no substantial risk of physical injury to the child, the trial court should exercise extreme prudence before placing that child under the guardianship of DCFS. See, e.g., In re J.P., 294 Ill.App.3d 991, 1005-06, 229 Ill.Dec. 565, 692 N.E.2d 338 (1998) (making similar analogy in wardship proceedings).
Unfortunately, more than two years have passed since S.S. was removed from R.S.'s custody. In the interest of S.S., and in the interest of judicial economy, we find it necessary to act pursuant to this court's authority under Supreme Court Rule 366(a)(5) (155 Ill.2d R. 366(a)(5)). We order that DCFS immediately return S.S. to his mother's custody upon the issuance of the mandate in this case.

V. CONCLUSION
We recognize the difficult decisions made by juvenile court judges. In this case, a very conscientious judge did his best to apply the law in a very difficult situation. We hold today that it is proper for the court to make a neglect finding and adjudicate wardship of a minor as to one parent while not finding neglect as to the other parent. In this manner, the fit parent may maintain custody of the minor while the trial court exercises its supervisory powers over the child's relationship with the other parent, pursuant to section 2-28 of the Act (705 ILCS 405/2-28 (West 1998)).
For the foregoing reasons, the order of the circuit court of Kane County declaring S.S. to be a neglected minor and making him a ward of the court is affirmed as to K.T. only. The order of the circuit court of Kane County declaring S.S. to be a neglected minor is reversed as to R.S. We hereby vacate the dispositional order placing S.S. under the guardianship of DCFS. We further order, pursuant to Supreme Court Rule 366(a)(5) (155 Ill.2d R. 366(a)(5)), that DCFS immediately return S.S. to R.S.'s custody upon the issuance of the mandate. We remand the cause with directions for the trial court to exercise its supervisory powers with regard to K.T. and his relationship with S.S.
Affirmed in part; reversed in part; vacated in part; order issued; and cause remanded with directions.
McLAREN and THOMAS, JJ., concur.