NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200257-U

NO. 4-20-0257

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 28, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.O. and J.M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 19JA26 |
| v. | ) | |
| Shamill H., | ) | Honorable |
| | ) | John R. Kennedy, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The adjudication that the children are neglected minors is not against the manifest weight of the evidence.

¶ 2     Respondent, Shamill H., is the mother of T.O., born March 28, 2006, and J.M., born August 21, 2012. She appeals from an adjudication by the Champaign County circuit court that the minors are neglected. Because we are unable to say that the adjudication of neglect is against the manifest weight of the evidence, we affirm the judgment.

¶ 3                                    I. BACKGROUND

¶ 4     In 2018, the Illinois Department of Children and Family Services (DCFS) investigated a report that T.O., who was 12 years old at the time, had put his penis into the anus of a four-year-old cousin. After an investigation, DCFS decided that the report was "indicated," meaning that DCFS found the report to be supported by a preponderance of the evidence.

¶ 5        In 2019, J.M. reported that T.O. "may have put his finger in [J.M.'s] butt," to quote from the testimony of Jerald Feingold, an investigator with DCFS. DCFS investigated the allegations of (1) sexual penetration of J.M. by T.O. and (2) inadequate supervision by respondent. Initially, DCFS found both allegations to be "indicated." Respondent, however, administratively appealed, and an administrative law judge overturned the "indicated" finding on the allegation that T.O. had sexually penetrated J.M.

¶ 6        Respondent is the person who called the DCFS hotline about both incidents. In consultation with DCFS, she came up with a safety plan. Henceforth, T.O. would have his own bedroom, and J.M. would sleep in respondent's bedroom. Cameras and door alarms would be installed. Respondent and her mother, Sharon M., would keep T.O. constantly under supervision. T.O. would attend psychiatric counseling.

¶ 7        Although respondent was unable to afford door alarms, Brianna H., T.O.'s half-sister, moved into the residence (temporarily as it turned out) to provide more adult supervision. Respondent took parenting classes. T.O. and J.M. both attended mental health counseling.

¶ 8        Despite those measures, Dr. M. Kathleen Buetow, a medical doctor and a doctor of public health at Carle Foundation Hospital in Urbana, Illinois, opined that J.M. and T.O. were "not safe in the same household." Dr. Buetow based her opinion on information she had received from Feingold, her interview of J.M., and her interview of respondent. J.M. had told a teacher at school: " '[M]y brother has a demon[,] and he put his finger in my butt[.] [M]y mother was going to kill him, but [G]randmother said no.' " After learning from Feingold about the anal penetration of the cousin and J.M.'s statement to the teacher, Buetow interviewed J.M. He told her that not only had

T.O. touched him on the behind under his clothes but T.O. had required him to touch his genitalia. Buetow transcribed the exchange between her and J.M. as follows:

> "Does your brother show you his wee-wee? 'No, I mean, yes.'
>
> How does he do that? 'He pulls his pants down.'
>
> What does he want you to do? 'Play with him.'
>
> What does he want you to do with his wee-wee? 'I do not know.'
>
> Does he want you to touch his wee-wee? "Yes.' When? "On his wee-wee.'
>
> When did he do that? 'When my mom is not in the room.'
>
> Did he do that one time or lots of times? 'Lots of times.' "

¶ 9    After interviewing J.M., Buetow interviewed respondent, who told Dr. Buetow that she believed what J.M. had told Dr. Buetow, for J.M. did not lie and T.O. was "very erratic in his behaviors" and "defiant." Respondent said she "[could not] control [T.O.] at home" and that his father—who "[did] not believe in medicating children and therefore *** ha[d] dropped his insurance on [T.O.]"—"ha[d] little to do with [T.O.]" Respondent had difficulty paying both for T.O.'s medications (Adderall and Risperdal) and his medical visits. Consequently, he was missing clinical appointments. He was suspended from school and "ha[d] been seen at least twice in the Emergency Department for aggressive behaviors." Respondent told Dr. Buetow that T.O. "did not respond appropriately to his hospitalization at Lincoln Prairie[;] he thought it was a joke."

¶ 10    Buetow offered the following impressions:

> "[J.M.] reports being sexually victimized by his older brother, [T.O.], which includes both digital penetration of his butt and a request for [J.M.] to touch the genitalia of [T.O.] It is apparent that these two boys are not safe in the same household. A temporary safety plan is placing [T.O.] in the apartment that his

19-year-old sister shares with two others. [T]his might be a temporary solution, but I would feel it would not work long-term. It is obvious that there needs to be a safety plan for [J.M.] and that there needs to be a definitive long-term plan to help [T.O.,] who seems to have numerous issues that must be addressed."

¶ 11 On the other hand, respondent presented the following evidence in her own favor. Since February 2019, T.O. had his own bedroom, J.M. slept in respondent's bedroom, and the two bedrooms were separated by the bedroom that Sharon M. used. T.O. was on a waiting list for counseling and had seen a psychiatrist. The reason for the delay in getting T.O. into counseling was that DCFS had given the counseling firm the wrong telephone number for respondent. Sharon M. testified that she, respondent, or both of them watched the boys at all times. Respondent likewise testified that the boys were constantly under adult supervision, at home and at school. Dr. Roselin Arunachalam, a child and adolescent psychiatrist at Carle, and Dr. Hudson Riehl, a clinical psychologist at Carle, both testified that, in their opinion, respondent and Sharon M. were responsible enough to supervise the boys. In May 2019, Morgan Thomas, a caseworker at Bethany Christian Services, installed door alarms in respondent's home, confirmed the sleeping arrangements, and testified that, far from expressing fear of T.O., J.M. had said that he wanted T.O. to continue residing in the home. Brianna H. testified that she had never been concerned about the boys' being left unsupervised.

¶ 12 Nevertheless, the circuit court found both counts of the State's petition for the adjudication of wardship to be proven by a preponderance of the evidence. Specifically, the court found count I to be proven, which alleged that J.M. and T.O. were neglected because of inadequate supervision, and the court found count II to be proven, which alleged that J.M. was neglected in that respondent had failed to protect him from sexual abuse.

¶ 13    In the succeeding dispositional hearing, the circuit court made both children wards of the court. The court found respondent fit, able, and willing to exercise guardianship and custody of J.M. Thus, guardianship and custody of J.M. were to remain with her. The court found respondent unable, however, to exercise custody and guardianship of T.O., and, accordingly, the court removed custody and guardianship of T.O. from respondent and placed guardianship and custody of T.O. with DCFS. The court gave DCFS the discretion to allow respondent supervised or unsupervised visitation of T.O.

¶ 14    This appeal followed.

¶ 15                            II. ANALYSIS

¶ 16    Respondent argues that she has done everything that DCFS recommended except that she could not afford to buy door alarms (but, as it turned out, Bethany Christian Services bought and installed them for her, in May 2019). She has given the boys separate sleeping quarters. She has made sure that they are under adult supervision at all times. She has taken them to mental health counseling. Respondent writes: "A year passed without incident, followed by a charge that an administrative law judge determined to be unfounded [citation], by six-year-old J.M., who nonetheless remained eager for his brother to remain with the family [citation]." To uphold the judgment against her on count I, respondent argues, we would have to impose upon her an unrealistic duty "to insure neither child would ever be injured."

¶ 17    As for count II, respondent acknowledges J.M.'s disclosures to Dr. Buetow. Even so, respondent argues that "such evidence does not prove [that respondent] failed to provide a non-injurious environment, unless one is prepared to disregard the preponderance of the evidence—the changed sleeping arrangements, the around-the-clock supervision, the door alarms, [and respondent's] attentiveness to the boys' needs."

¶ 18　　　　But the only witnesses who would have known whether T.O. was under "around-the-clock supervision" in the home were those who lived with T.O. around the clock, namely, respondent, Sharon M., and J.M. (It appears, from Dr. Buetow's interview of J.M., that Brianna B. has moved out.) According to J.M., T.O. had urged J.M. to " '[p]lay with' " his exposed genitalia " '[l]ots of times,' " when their mother was " 'not in the room.' " It is unclear when those " '[l]ots of times' " happened, whether before or after the formulation of the safety plan. But respondent commented to Buetow that she "[could not] control [T.O.] at home," she "has multiple sclerosis," and T.O. "[was] very sneaky and that he [was] too much for her." Given those admissions, the circuit court could have chosen to disbelieve the testimonies of respondent and Sharon M. that they had been keeping T.O. *constantly* under supervision in the home.

¶ 19　　　　In short, respondent and Sharon M. did not have to be believed in their characterizations of their own supervisory efforts. "A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one. [Citation.] This is so because the trial court is in a much better position than the reviewing court to observe the witnesses, assess their credibility, and weigh the evidence." (Internal quotation marks omitted.) *In re S.S.*, 313 Ill. App. 3d 121, 127 (2000). The record does not clearly demonstrate that respondent's and Sharon M.'s representations of around-the-clock supervision *had* to be believed. See *id.* A reasonable trier of fact could find that when T.O. and J.M. lived together in respondent's home, they were in an environment injurious to their welfare in that T.O. was furtive and uncontrollable by his mother and grandmother and that, consequently, J.M. was at risk of being sexually abused and T.O. was at risk of inflicting the sexual abuse. See 705 ILCS 405/2-3(1)(b) (West 2018). We conclude, then, that the adjudication of neglect is not against the manifest weight of the evidence. See *S.S.*, 313 Ill. App. 3d at 127.

¶ 20                                    III. CONCLUSION

¶ 21            For the foregoing reasons, we affirm the circuit court's judgment.

¶ 22            Affirmed.